## In re PUBLIC LEDGER, Inc.

### Nos. 9096, 9098.

Circuit Court of Appeals, Third Circuit.

Argued Oct. 14, 1946.

Decided April 25, 1947.

Rehearing Denied June 14, 1947.

M. H. Goldstein, of Philadelphia, Pa. (Albert B. Gerber and S. Harry Galfand, both of Philadelphia, Pa., on the brief), for Raymond A. Goldsmith.

Harry Reiss Axelroth, of Philadelphia, Pa. (Axelroth & Porteous and Daniel J. McCauley, Jr., all. of Philadelphia, Pa., on the brief), for Daniel J. McCauley.

David Rosen, of Philadelphia, Pa. (Sidney Chait and Hirschwald, Goff & Rubin, all of Philadelphia, Pa., on the brief), for Warthman and others.

Before ALBERT LEE STEPHENS, GOODRICH and McLAUGHLIN, Circuit Judges.

ALBERT LEE STEPHENS, Circuit Judge.

This opinion treats of two appeals, both of which arise from claims of employees in the bankruptcy proceedings of the Public Ledger, Inc., a corporation, which for many years published a daily newspaper in Philadelphia, Pennsylvania.

Members of the Philadelphia Typographical Union No. 2, I. T. U., in the name of Daniel J. McCauley, presented claims in bankruptcy court, and members of the Newspaper Guild of Philadelphia and Camden, New Jersey, in the name of Raymond A. Goldsmith, likewise presented claims in bankruptcy court. All such claims were disallowed, and the District Judge affirmed. These appeals followed. Throughout this opinion we shall abbreviate "Public Ledger, Inc." to "Ledger"; "Philadelphia Typographical Union No. 2, I. T. U." to "Typographical Union"; and "The Newspaper Guild" to "Guild". We shall occasionally refer to Typographical Union and Guild as claimants.

For some time prior to the proceedings in bankruptcy court, the Typographical Union had been bargaining agents for a group of Ledger employees, and the Guild had been bargaining agent for another group of Ledger employees. Each agent had negotiated a contract with Ledger.

On November 7, 1941, Ledger filed its petition under Chapter X of the Chandler Act, 11 U.S.C.A. § 501 et seq., and the court made its order approving the petition, appointing trustees, and directing them in part as follows (successive orders extended the operation of the business thirty, five, twelve and seven days):

"Section 6: That the Trustees herein be, and are hereby authorized and directed, pending further order of this court, to manage, maintain and operate, and to keep in proper condition and repair, assets and property of the debtor, wherever situated; and to manage, operate and conduct the business of the debtor and to this end to exercise its authority and franchises and discharge all duties obligatory to it; and to employ and/or discharge, and fix the compensation of all employees; and to collect and receive the income, rents, revenues, royalties and profits of said assets, properties and business; to collect all outstanding accounts; to continue until further order of this court the business of the debtor for a period of six (6) days from the date of this appointment; to-wit, until the close of business on Thursday, November 13, 1941, making purchases of supplies and sales of products in the regular course of business; paying current wages, all according to law and subject to such supervision and control by this Court as the Court may exercise by further orders applied for herein."

Prior to the filing of the petition Ledger had been running a deficit, having lost half a million dollars during the last calendar year of the newspaper's publication, with the losses continuing up to the time the publication was suspended.

On January 5, 1942, the court ordered a discontinuance of the business, and the claimants' employment ceased.

On March 13, 1942, the court issued an order, adjudicating Ledger a bankrupt, continuing the trustees in office and referring the matter to a referee in bankruptcy. All current wages, the same as had been paid under the labor contracts, which had accrued from the time the trustees took office, November 7, 1941—January 5, 1942, inclusive (not including vacation or severance claims), together with all unpaid current wages incurred by Ledger prior to its petition under the Chandler Act to November 7, 1941, had been paid. There is no accounting issue presented by either appeal.

### The Typographical Union Members' Claims.

Provision in the Typographical Union-Ledger contract is made for vacation with pay, and the legal issue is related to the following excerpt from the contract:

"Beginning with the calendar year 1941, vacation with pay in advance shall be given on the following basis: (a) Employees who have held situations during the entire previous year shall be entitled to two weeks' vacation (ten days with pay) during the next calendar year. All other employees hired by the office shall be entitled to one day's vacation with pay for each twenty-six days worked in the preceding calendar year."

A number of Ledger employees had "held situations" throughout the calendar year of 1941, and some for lesser periods. The business was shut down on January 5, 1942, and all employment was discontinued before the employees had had the opportunity of taking their vacations. They filed claims for the vacation pay.

The denial of the claims was upon the ground that the contract providing for vacation with pay had never been assumed by the trustees, and upon the further ground that the contract could not be assumed legally without the court's specific authorization, which was never given.[1]

The evidence is all one way, however, that no act of the trustees was inconsistent with the terms of the contract, and that every act of the trustees in relation to the employees was in complete accord with its terms. Mr. Robert Cresswell was the trustee in active charge of the business from the time the Chapter X petition had been filed and approved, and theretofore had been the Ledger's president, and as such he had signed the labor contract. Three letters from Mr. Cresswell, touching the subject, are in the margin.[2]

---

[1] The Bankruptcy Act provides in § 70, sub. b, 11 U.S.C.A. § 110: "Within sixty days after the adjudication, the trustee shall assume or reject any executory contract, including unexpired leases of real property: Provided, however, That the court may for cause shown extend or reduce such period of time. Any such contract or lease not assumed or rejected within such time, whether or not a trustee has been appointed or has qualified, shall be deemed to be rejected. A trustee shall file, within sixty days after adjudication, a statement under oath showing which, if any, of the contracts of the bankrupt are executory in whole or in part, including unexpired leases of real property, and which, if any, have been rejected by the trustee: Provided, however, That the court may for cause shown extend or reduce such period of time."

It should be noted that the Act does not specify the manner of acceptance of an executory contract. Though a trustee must list all executory contracts within sixty days as well as which of them have been rejected, it is not clear as to the manner of showing those executory contracts which have been accepted. Acceptance may be by conduct as well as by a writing or by oral statement.

The operation of the business by the trustees extends over but fifty-nine days. See discussion re above section of the Bankruptcy Act in Collier on Bankruptcy, 14th Ed., Vol. 4, pp. 1232-33-34.

[2] "December 8, 1941.

To all Employes:

In response to a number of inquiries, I would like to say that the plan for the retrenchment in personnel and wages which was discussed with you and with your union representatives last Wednesday and Thursday is being carefully studied before submitting them to the court as a part of the reorganization program.

In several instances a formal vote by the membership of the union involved, or else by the Ledger employes belonging to that

The evidence compels the conclusion that all persons concerned were exercised over the extreme delicacy of the situation, and that the court, the trustees, and the employees hoped that reorganization would be effected with little delay, that publication of the paper would continue, and that employment under the reorganized business would go on without interruption.

It was the trustees' responsibility to keep a labor crew at work and their responsibility to fix the terms of keeping the crew at work. They chose to keep the old crew upon the old terms. There is nothing in the evidence to indicate that the trustees sought to extend the contract beyond their own period of service, but the evidence is conclusive that they sought and obtained the services and proceeded throughout the period of their stewardship to benefit by them with the full knowledge that the services were being given under the terms of the contract. There was no break in the services under the contract; at least there was none before the court ordered the business shut down. No one acquainted with the circumstances can doubt that the trustees took the wisest course open to them in their endeavor to obey the court's order "to manage, operate and conduct the business * * * and to employ and/or discharge and fix the compensation of all employees." [3]

---

union, is necessary before we can proceed.

In any event, I want you to know that we are aware of the personal uncertainty that many of you must be feeling, and we shall do everything possible in our power to put into effect the anticipated adjustments without undue delay. However, in my opinion, there is no announcement likely to be made before Friday, December 12th.

Robert Cresswell."

"Evening Public Ledger
Independence Square
Philadelphia

Robert Cresswell
Publisher

December 8th, 1941.

Dear Mr. Muir:

I want you to know how much I appreciate the helpful and constructive attitude demonstrated by you at the meeting of union officials held in our office on Wednesday morning, December 3rd. The sympathetic attention given to the Ledger's problems by all the men present, coupled with their publicly expressed willingness to place before the members of their various organizations the suggestion that they acquiesce in contract modifications during this emergency, was not only encouraging to me personally in the job that I am trying to do in connection with reorganizing this newspaper, but has also proved to be impressive to the group of investors whom I am endeavoring to interest in this project.

I understand that there are certain formalities,—such as conferences with executive committees, and perhaps with membership,—that have to be accomplished before we can receive your formal assent to our retrenchment plan. Will you therefore be good enough to get in touch with me as soon as you are ready to discuss the actual and practical details of the program as it affects your own organization? May I also ask you to remember that the time available is short?

Faithfully yours,
Robert Cresswell.

Mr. Sinclair L. Muir, Pres.,
Philadelphia Typographical Union,
1530 Cherry Street,
Philadelphia, Pa."

"Evening Public Ledger
Independence Square
Philadelphia

Robert Cresswell
Publisher

January 13, 1942.

Mr. Sinclair L. Muir, President,
Phila. Typographical Union No. 2,
1530 Cherry Street,
Philadelphia, Pennsylvania.

Dear Mr. Muir:

I cannot wind up the affairs of the Evening Public Ledger without expressing to you my personal thanks for the sincere and earnest effort that you made to assist us all in keeping the Organization alive. Your members ought to be proud that they have a leader with vision.

I am only sorry that you and I will not have the opportunity to work out our mutual problems over the years in the same spirit of understanding and helpfulness displayed by you during our close association in the past few weeks.

Yours faithfully,
Robert Cresswell."

[3] In Finletter, Law of Bankruptcy Reorganization (1939), p. 205, it is said: "The controlling fact * * * is that a reorganization trustee operates the properties for the benefit of the private parties concerned with a view of making the maximum profit for them. He stands in the position of the employer * * *."

A point is made by appellee that the original authorization for continuing the business was but five days, and that the successive extensions were for short periods of time, and that, therefore, it is reasonable to infer that the court did not authorize or intend to authorize assumption of the contract. We think the inference unjustified. It is quite evident that the court expected that a workable plan for reorganization was possible of adoption within a short period of time, and, of course it knew that labor tranquility was necessary. The court knew, too, that good labor conditions under the contract constituted a valuable asset, and a necessary one to any possible reorganization or sale of the Ledger as a going concern. It is unreasonable to assume that the court contemplated anything but the continuance of the labor contract as the basis for the continued services of the employees.

In an article by Clark, Foley and Shaw, Adoption and Rejection of Contracts and Leases by Receivers (1933), 46 Har L.R. 1111, "adoption" is explained as follows: "The term adoption is usually applied * * * to a situation in which a receiver either (a) indicates an intention fully to perform the obligations of the insolvent, (b) indicates an intention to insist on full counterperformance, or (c) acts in such a way with reference to a contract * * * that fairness to the solvent party requires that the consequences of adoption be attributed to his action," and at page 1125, "* * * some action by receiver may be held to amount to adoption despite an intention to the contrary."

Appellees advance the argument that there is a privilege of "experimental assumption", that is, that the trustees "may ride along on a contract for a short time on an experimental basis." See Butterworth v. Degnon Contracting Co., 2 Cir., 214 F. 772, cited in the discussion of the subject by the court below. In our view it makes little difference as to the issues concerning these claims of employees whether the trustees expressly assumed the contract or merely knowingly conformed to its terms. The trustees could not seek and accept the benefits of the employment under the favorable terms of the contract without for the time of enjoying them, accepting and yielding to terms deemed burdensome. In the instance under discussion, the continuation of the employment under the terms of the contract after the trustees took charge was not solely upon the part of the trustees in merely riding along, that is. permitting the employees to continue their duties without mention of terms, for there was active cooperation in regard to the employment not alone between employer and employees but between the bargaining agent and the trustees. See Jacob v. Roussel, 156 La. 171, 100 So. 295.

It is thus seen that the labor contract continued to be effective throughout the administration of the estate by the trustees, and that the doctrine of experimental assumption is inapplicable.

The real question is: Can the employees participate in the estate funds after liquidation in satisfaction of their claimed vacation pay rights? A little while ago we quoted from Finletter to the effect that the trustees stand in the position of the employer. But this is not the whole story. During the time the trustees are conducting the ailing business, they are the court's helping hand to it. In liquidation they guard the estate properties and convert them to money for just distribution to creditors. When a business fails, and its owner is insolvent, its properties are put into trust with the court for equitable distribution and there is neither equity nor statute which prevents the workmen from sharing in the estate.

In our opinion, the Second Circuit met the question squarely and correctly in Re Wil-Low Cafeterias Inc., 111 F.2d 429, at page 432, and we quote from the opinion:

"A vacation with pay is in effect additional wages. It involves a reasonable arrangement to secure the well being of employees and the continuance of harmonious relations between employer and employee. The consideration for the contract to pay for a week's vacation had been furnished, that is to say, one year's service had been rendered prior to June 1 (adjudication taking place on June 7), so that the week's vacation with pay was completely earned and only the time of receiving it was postponed. If the

employer had discharged the employee wrongfully after the latter had done the work necessary to earn a vacation he could not be deprived of the benefits due him. * * * In the Wisconsin case the employee had substantially performed his contract and earned a bonus which he was not to receive until the end of the year. He was entitled to it where there had been an unjustifiable discharge. It can make no difference whether the discharge is due, as here, to a cessation of business by the employer, or was wrongful. In either event an amount earned would be a valid expense of administration.

"In Donlan v. Boston, 223 Mass. 285, 111 N.E. 718, 719, a school teacher died during the summer vacation having completed her teaching for the preceding academic year. Her salary was payable monthly and payment of salary for the last month of the year had not become due at the time of her death. The Supreme Court of Massachusetts treated the contract as subject to 'an implied condition * * * that she should be living and physically able to do the work' and disallowed her salary for the final month. With much respect we cannot agree with the decision. It has been criticized by Professor Williston in a footnote to Sec. 838 of the Revised Edition of Williston on Contracts published in 1936. He says: 'There was no express condition, qualifying the city's promise, and as the teacher had substantially fulfilled her contract, there was no failure of consideration.' In the case at bar similarly the claimant had worked for a year and was entitled to his vacation pay. * * * In these days of collective bargaining between labor unions and corporations it would seem strange that the contract which had been arrived at by negotiation, usual in form and substance and relating to ordinary wage arrangements should be held unauthorized because it contained a provision for one week's vacation to all employees who had been with the firm more than a year before it was entered into."

Appellees rely heavily upon Erie Malleable Co. v. Standard Parts Co., 6 Cir., 299 F. 82. We have examined the opinion in that case, and it does not conflict with In re Wil-Low Cafeterias, Inc., supra. The material difference between the two cases is immediately apparent when it is understood that in Erie Malleable Co. v. Standard Parts Co., the trustees, if they made any new agreement at all with the claimant, entered into a new contract which, by its terms, acted to bind the reorganized enterprise to a long time future personal service. The contract was not necessary to the due administration of the estate while in bankruptcy, and the facts presented no influencing equitable facts in favor of it.

In the case from which we have so liberally quoted the contract was negotiated by the trustees to apply to the business they were conducting under a reorganization proceeding, while in our case the trustees assumed control of the business subsequent to the negotiation of the labor contract and its subsequent effective date. We see no distinction in principle between the cases upon the broad question of allowing the claims against the estate. All of the claims in Re Wil-Low Cafeterias, Inc., were allowed the priority of administration expenses, since all of the service was given to the trustees in their handling of the business. This, as has been seen, is not so in our case, and this difference, we think, effects the priority to be accorded the claims in our case.

It is flatly held in Re Wil-Low Cafeterias, Inc., that "A vacation with pay is in effect additional wages." The Typographical Union employees' wages then consisted of the weekly pay envelope, plus "vacation pay". The provisions for vacation pay fall easily into an ascertainable daily compensation. If one works the full calendar year, he has earned two weeks' vacation with ten days' pay. This obviously is upon the basis of two five-work-day weeks. But he does not have to work a full year to earn vacation with pay. For whatever the length of his service less than the year, he earns vacation with pay at the rate of one day for every twenty-six days. There are fifty-two weeks in a year, and five days to each week (so provided in the contract), or two hundred sixty work days. For the year's service the employee gets an additional ten days' pay, or vacation with pay, or exactly one day's additional pay for every twenty-six days he works. It

follows with perfect logic that the vacation pay so earned before the trustees took charge does not constitute wages as administration expenses, because the service was not given during the reorganization period, and it follows logically that vacation pay earned under the trustees' management does constitute administration expense, and is within the priority such status entitles it to enjoy.[4]

We now come to the priority that is provided specifically for wages earned. Section 64, sub. a(2), 11 U.S.C.A. § 104, sub. a(2), provides, "* * * wages, not to exceed $600 to each claimant, which have been earned within three months before the date of the commencement of the proceed-

ing, due to workmen, servants, clerks * * *" are entitled to priority. Such priority as to wages, including the vacation pay, which falls within this provision, must be allowed by virtue of the above equation.[5]

### The Typographical Union Members' Severance Claims.

The Typographical Union-Ledger contract contained provisions under which severance pay with priorities is claimed. It provided that "Two working days' notice shall be given a situation holder before being laid off." Other provisions in the contract covering the subject of layoff and discharge are set out in full in the margin.[6] However, our discussion which follows

---

[4] Claims for labor performed under the authority of a receiver are expenditures in preservation of the estate and entitled to priority under § 64, sub. a(1) of the Bankruptcy Act. See In re Hughes, D. C., 170 F. 809, " * * * wages and salaries earned during bankruptcy are a part of costs of administration and enjoy a first priority." Collier on Bankruptcy, pp. 2063, 2087.

[5] In the case of In re New England Thread Company, 1 Cir., 158 F. 788, 792, it is said that "It is plain * * * that 'wages' must be construed in its broader and more general sense as meaning compensation for services rendered * * *", and in the case of In re Roebuck Weather Strip & Wire Screen Co., D.C., 180 F. 497, 498, that "The term 'wages,' as used in this section [§ 64, sub. a(2)], has received a very liberal construction." " 'Wages' is the reward paid for labor." In re Thomas Deutschle & Co., D.C., 182 F. 430, 431. Wages given priority under § 64a(2) means wages which are owing at the time of bankruptcy even though they may not be due in the sense of being immediately payable, and which have accrued within three months. Where employees clerks are given vacations with pay, but pay is withheld until the end of the year, the employer in the meantime becoming bankrupt, they are entitled to prove their claims under § 64, sub. a(2). In re B. H. Gladding Co., D.C., 120 F. 709. Nor does a preferred claim for wages due in bankruptcy depend upon the mode of compensation. In re Deutschle, supra. Where only a part of the claim accrues within the three months, it is entitled to priority only as to that part. In re Burton Bros. Mfg. Co., D.C., 134

F. 157. "It was obviously not the purpose of this clause to make a distinction between wages due which have been earned and wages due which have not been earned; but merely to limit the priority to wages owing which had accrued within a limited period. The relation of the parties as employer and employed was not affected by the fact that the employer voluntarily released the clerk from the obligation to perform services during a vacation period. To attempt distinctions between wages due which are earned and wages due which are not earned, by an inquiry into the amount of work done by the wage earner, would be entirely impractical. * * * Vacation wages cannot be regarded as a mere gratuity, given in recognition of past or present services. * * * The relation of the employer and employed is as strictly a business relation as it is during the working season, and there is full legal consideration for the master's promise to pay wages during this period." In re B. H. Gladding Co., supra, D.C., 120 F. at page 711.

[6] *Layoff of Regulars:* Two working days' notice before the end of the fiscal week shall be given a situation holder before being laid off.

When it becomes necessary to decrease the force in an office the foreman shall determine upon what class of work the reduction is required. The member with lowest priority standing in the office engaged upon the class of work indicated shall be laid off first. Provided, the member to be laid off may claim any other work he is competent to do which is being performed by a member with lower priority standing. Provided fur-

cannot be readily understood without an understanding of all of the provisions quoted.

It will readily be seen that the subject of discharge, as it is treated in the contract, refers solely to discharge for cause. No rights are reserved in the contract to the employer to dismiss any individual employee upon his own uncommunicated reason or whim. All discharges of specifically named individuals are subject to the review of a "Joint Standing Committee" upon the issue of incompetency, duty neglect, violation of office rules, or any one or any number of such charges.

 All other separations from employment are provided for under the subject of "layoffs" and the only cause for layoff is covered by the sentence in the contract, "When it becomes necessary to decrease the force in an office [meaning a department of the ·business] the foreman shall determine upon what class of work the reduction is required." Then a detailed procedure is provided, which, when followed, results in the layoff (temporary or permanent) of the employee lowest in priority standing. It is our opinion that the "layoff" provisions of the contract are in fact provisions covering discharge as well as temporary layoffs. They are a part of the wage compensation agreed upon and are entirely reasonable as protection to the workman against having his needed income stop without even a day ·to meet emergencies.[7]

 Having gone· this far in our conclusions, the question is presented whether suspension of the business in bankruptcy is a "discharge" within the meaning of the contract provisions subtitled "Layoffs".

The appellees argue "that the bankruptcy of Public Ledger, Inc., was not a discharge or layoff, but that the continued operation * * * was a condition of the contract and that the bankruptcy brought about a failure of that condition. A contrary holding would make Public Ledger, Inc., an insurer of its own business as it would have to guarantee its continued operation." We do not follow appellees in their argument. The claims under the layoff provision of the contract are for wages. The provision protects against a sudden, unexpected and unprepared for. stoppage of wages. It provides that knowledge of a break in the continuity of work and the consequent lack of pay shall be given the employee and it is the employer's duty to give it. If he does not give it, the wage continues unaffected for the term of the required notice. Whether the layoff occurs through bankruptcy or any other cause does not affect the validity of this wage requirement. For the lack of a better term, we call this contractual arrangement one for severance pay.

 Is the severance or discharge pay entitled to priority as costs of administration? Section 64, sub. a(1) provides that such costs, to have priority, must be the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition. Do the facts bring these claims within this limitation?

We have seen that the trustees and the employees continued the employment upon the same terms as were provided in the collective contract, and, therefore, while the employees were under the duty of delivering their services in accordance therewith, the employer was under the correlative duty of paying them in accordance there-

---

ther, a member claiming other work to avoid layoff shall not be exempt from discharge if incompetent.

*Discharge:* The foreman may discharge (1) for incompetency, (2) for neglect of duty, and (3) for violation of office rules which shall be approved by the management and kept conspicuously posted. Provided, that if a chapel chairman is discharged the Publisher shall notify ·the Union giving reasons for the discharge in writing.

*Discharge Notice:* When a member is discharged the ·foreman shall immediate-

ly give in writing the reason for discharge.

*Appeal from Discharge:* A member who believes he has been illegally or unjustly discharged shall have the right to appeal to the Joint Standing Committee without any intervening action within five days of the date of receiving discharge notice in writing.

[7] Wages are compensation for services rendered, In re New England Thread Co., 1 Cir., 158 F. 788, 792, and this provision constitutes an agreed compensation for services.

with. It follows, then, that the employees were protected against an unnoticed sudden discharge. We do not know why the trustees—and the former president of the company was one of them—did not give the notice required. It may well be that efforts at reorganization broke down suddenly and that it was better business to discharge immediately and pay the severance allowance rather than publish even a day longer. At any rate the trustees' action in assuming the contract obligations was taken in good faith and according to their best judgment and must be held to have been a necessary expense in administering the estate and is entitled to priority as an administration expense [§ 64, sub. a(1) of the Act.].

As a recapitulation, the vacation with pay is held to be wages earned throughout the period of service and entitled to be paid by the estate. All earned under trustees' management are administration expenses and entitled to priority in payment as such, and all vacation pay falling within § 64, sub. a(2) is entitled to priority standing. The severance pay, in that it moves to all employees regardless of length of service, is held to be wages wholly earned and accrued under the trustees' management and, therefore, is entitled to priority as such. § 64, sub. a(1).

*The Guild Members' Claims for Severance or Discharge Pay.*

A written contract by and between the Guild and Ledger was entered into on December 23, 1940, effective to July 21, 1941, provided that at least sixty days before its expiration, notice should be given by either of the parties as to any desired alteration or extension of the contract beyond its expiration date. Notice was given on May 28, 1941, by the Guild that it desired to negotiate a new contract calling for extensive alterations of the existing contract. Meetings were held to consider possible changes in the contract. Written extensions of the contract were made to continue it in effect beyond July 31, 1941, "until such a time as a new contract shall have been negotiated." The trial court found upon ample evidence that the contract was in existence, at least as late as November 7, 1941, and we accept and proceed upon that finding as a fact.

The Guild-Ledger contract provides: That "The Ledger shall pay immediately to any employee to whom this contract applies, who is discharged, except an employee who deliberately provokes his discharge in order to obtain severance pay, or an employee who is required to be discharged because of failure to maintain good standing in the Guild, a sum of money in cash equivalent to: Two weeks' pay if employed more than a total of six months and less than one year * * *." (There are additional provisions in the contract providing differently for employees with longer standing periods of service.)

The Guild members filed proofs of debt under this section and claimed priority of their claims as wages.

We find, as we found under the Typographical contract, that the terms and conditions of the contract between Guild and Ledger were conformed to without the slightest indication of an intent to reject or ignore any of them. Mr. Warthman, one of the trustees, testified that "* * * In order either to allure new capital or get a reorganization of some sort, we went along with you on this contract because we did not want to 'upset the applecart'." Indication that the trustees regarded the bargaining contract as governing the employment is that the trustees deducted the Guild members' dues from the wages and made overtime payments in accord with the contract provisions.

At a meeting between the representatives of the Guild and the trustees, held November 11, 1941, the discussion was testified to by one witness as being somewhat as follows: "The trustees, speaking through Mr. Grosscup, or Mr. Grosscup speaking for the trustees, then said * * * that they were acting and would continue to act to enforce all the terms and conditions of the contract * * *. The other trustees assented to the statement of Mr. Grosscup, and we proceeded then to a discussion of general co-operation and so forth." See Bradford v. Kurn and Lonsdale, 235 Mo. App. 1282, 146 S.W.2d 644; Detroit & T. S. L. R. Co. v. Detroit T. & I. R. Co., D.C., 290 F. 549; Easton v. Houston & T. C. Ry. Co., C.C., 38 F. 784; and De Wolf v. Royal Trust Co., 173 Ill. 435, 50 N.E. 1049.

The facts compel the holding that the employment of Guild Members by the trustees was on the terms prescribed by the Guild-Ledger contract. We hold, as we hold in the matter of the Typographical Union employment, that the court's order authorized this action. It was not an unusual or unreasonable act to, provide for severance pay, for according to Mr. Way, a qualified witness, inclusion of such a provision is " * * * as widespread as Guild contracts—they are, and have been [common], since early 1937 and late 1936 * * *." [8]

The trustees approach the problem from the premise that discharge of an employee, without cause, is a breach of the contract, and that cessation of the hiring through bankruptcy does not constitute a breach. In their brief, they say: "When the employer fails to continue his business, because of bankruptcy, can it be said that it is such a breach that it places upon him the duty and obligation that is placed and assumed by a person who breaches his contract? It is respectfully submitted that the bankruptcy of Public Ledger, Inc., was not a breach of this provision of the contract * * *." The point is not sound, for the severance pay demand is not based upon breach of contract, but is a claim within the terms of hiring.

The claimed discharge occurred upon the suspension of the newspaper and the consequential cessation of employment. The appellees argue that the closing up of a business does not constitute a discharge, and cite the district court opinion in Re Wil-Low Cafeterias, Inc., S.D.N.Y., 1939, 71 F.Supp. 685, not reported. What the trial court held in that case, to which this argument is directed, was that the pertinent provision of the Wil-Low contract was one covering such layoffs that could be distinguished from "discharges". We have just indicated our holding that "layoffs" under the contract in the instant case includes all discharges except for cause attributable to the employee. (We do not examine the contract in the Wil-Low case in this particular.) Therefore, the unappealed part of the trial court's decision in the Wil-Low case has no relation to, or influence on, the problem we are considering.

In the case of In re Men's Clothing Code Authority, U.S.D.C.,S.D.,N.Y., 71 F.Supp. 469, in a memorandum opinion, C. C. H. Bankruptcy Serv. Dec. Vol., Para. 4569, the court held that bankruptcy constituted a discharge entitling the employee to severance pay.

In the case of Matthews v. Minnesota Tribune Co., 215 Minn. 369, 10 N.W.2d. 230, 232, 147 A.L.R. 147, the defendant's sale of its newspaper assets and retirement from the publishing field constituted a dismissal of the plaintiffs within the meaning of the severance pay provision of the contract. That is, such an act was held to have constituted a termination of plaintiff's employment and a discharge of the employees as a whole. We quote from the opinion: "Defendant contends that it was error to exclude proffered evidence to show the meaning of the word 'dismissal' as used in the guild contract and the purpose of the severance pay contract. It seems to us that the meaning of the word 'dismissal' is clear. The contract provides for severance pay 'upon dismissal, except for drunkenness, proven dishonesty or gross neglect of duty.' There are three exceptions from the provision that severance pay is due upon dismissal. Evidence to add another such exception would modify the contract. Where the contractual language is clear and unambiguous there is no room for construction." This case has been followed and approved in Gaspar v. United Milk Producers of California, 62 Cal.App.2d 546, 144 P.2d 867, wherein cessation of employment by reason of a sale of assets constituted a discharge.

The appellees seek to discredit the above case by citing New York cases, Amelotte v. Jacob Dold Packing Co., 173 Misc. 477, 17 N.Y.S.2d 929, and Neves v. P. S. Thorsen & Co., Inc., Mun.Ct., 35 N.Y.S.2d 678. The cases are not in point. They do not involve severance pay contractual provisions but

---

[8] The opening brief for the Guild members contains a very interesting discussion upon the thesis that the bankruptcy court cannot disturb a collectively bargained labor contract. We do not pass upon it, as we are confident that the members of the Guild were kept at work under the terms of the Guild-Ledger contract.

rather damages for alleged breaches of contracts of employment. The claims in those cases were based on the theory that a collective bargaining agreement amounted to a promise by the employer to furnish each member of the contracting union employment for the term of the contract. The cases hold that such a theory is incorrect. In the instant case the claims are not for damages for breaching the contract to keep the Guild members employed for the contractual period beyond January 5, 1942, but rather for severance pay, which accrued under the contract when they lost their jobs through the business management's act of shutting the business down.

 We hold that the cessation of the business constituted a discharge under the terms of the contract, and that the claims properly made under it are legal claims against the estate.

 It is argued that severance pay provision is a penalty and that the bankruptcy court as a court of equity does not or should not enforce a penalty. The very purpose of the provision indicates appellee's error. The United States Department of Labor, Bulletin No. 686, Union Agreement Provisions, page 71, states the purpose of such a provision in the following manner: "* * * dismissal compensation is designed to ease the burden resulting from unem-ployment * * *. Dismissal compensation * * * indemnifies the employee for final loss of his job * * *." It is a wage contract right and in no sense a punishment visited upon the employer.

 While not exactly like the vacation with pay provided in the Typographical contract, the discharge pay in the Guild contract is similar in that it also is premised upon length of service. The arithmetical problem of allocating a proper part to administration services under § 64, sub. a(1) and to the provisions for wage priorities under § 64, sub. a(2) is not as simple as that of the Typographical contract. However, the principle to be applied is not different. We hold that the discharge provision of the Guild contract relates to wages and any sum received by the employee under it is a part of his wage. Upon the conditions of the contract being met, money earned each day of the service matures in time to the status of a due debt. Each claim, therefore, should be allowed in its rightful sum as a charge against the estate and that portion which was so earned under the trustees' management should be given the priority due to administrative expense. The same principle should be applied under § 64, sub. a(2) of the Bankruptcy Act, the provision for priority of wages. We illustrate in the margin.[9]

---

[9] *Guild—Contract:* Severance provision: Two weeks' pay was allowed to employees who had worked more than 6 months and less than 1 year (with additional provisions for longer periods of service). Thus, an employee had to work a given length of time before he could earn a right to severance pay, due on discharge. That is, as he went along in his employment, he was earning each day a certain amount of severance rights, to become due him if and when he was discharged. Thus, the severance pay was a debt which was allocable against the period in which it was earned.

Administration expense: Under 64, sub. a(1) the amount of severance pay earned during that period constituted an administrative expense entitled to priority as such.

*Schedule of Priorities:*

Wage priority: Under 64, sub. a(2) the amount earned during the 3 months preceding bankruptcy and not more than $600 was entitled to priority as such.

The remainder constituted a general claim against the estate, that is, the portion earned prior to the 3 months.

*Chart Under Guild—Contract:*

1. Nov. 7 to Jan. 5—period of administration—approximately 2 months.

2. Period of wage priority—3 months before bankruptcy.

3. Remaining period—variable.

Assume one man had worked 1 year and entitled to 2 weeks' pay ($100) (A), and assume another man had worked 2 years and entitled to 4 weeks' pay ($200) (B).

| | A | B |
|---|---|---|
| 1. Admin. period (2 mons.) | $16⅔ | $16⅔ |
| 2. Wage priority (3 mons.) before bankruptcy | $25 | $25 |
| 3. General claim | $58⅓ (7 mons.) | $158⅓ (1 yr., 7 mons.) |

There are several instances in our treatment of the Typographical Union appeal of principles common to both appeals. We adopt them without repetition to the Guild appeal.

As a recapitulation, under the Guild contract the money to be paid under the provision for discharge pay is held to be wages and entitled to payment out of the estate. That part earned under the administration of the trustees is entitled to priority as administration expenses, § 64, sub. a(1). That part earned within the provisions of § 64, sub. a(2) is entitled to the priority provided for by that section of the Bankruptcy Act. (Here the severance pay was conditioned upon a given length of service.)

The order which follows does not adjudicate the correctness or the genuineness of the claims but only the legal principles applicable to them as herein set down. Insofar as the orders appealed from are not in accord with this opinion, they are reversed. The proceedings are remanded to the District Court with directions to allow and deny the claims in accordance with this opinion.

Remanded with instructions.