Joseph P. MONTEROSSO et al., Appellants,

v.

ST. LOUIS GLOBE–DEMOCRAT PUBLISHING COMPANY, Respondent.

No. 49603.

Supreme Court of Missouri,

Division No. 1.

April 8, 1963.

Motion for Rehearing or to Transfer to Court En Banc Denied June 4, 1963.

Jerome J. Duff and John D. Chancellor, St. Louis, for appellants.

Hocker, Goodwin & MacGreevy, Lon Hocker, St. Louis, for respondent.

HOUSER, Commissioner.

This is an action by sixty-four members of St. Louis Mailers' Union, Local No. 3 of the International Typographical Union, against the corporate publisher of St. Louis Globe-Democrat for vacation pay, severance pay, and penalties under § 290.090, V.A. M.S., under a collective bargaining agreement. Tried to the court without a jury on an agreed statement of facts, the court rendered judgment for plaintiffs for $17,-462.90 plus interest for vacation pay, but denied plaintiffs' other claims. Globe-Democrat did not appeal. Plaintiffs appeal from the order and judgment overruling their after-trial motions, now contending that in denying their claims for severance pay and penalties and interest (totaling more than $140,000) the court misconstrued the contract. We have jurisdiction because the amount in controversy exceeds $15,000, and we consider the appeal on its merits notwithstanding plaintiffs did not appeal from the judgment on the merits, because that was the evident intention of plaintiffs.

Plaintiffs were employees of and "regular situation holders" with the Globe-Democrat. The terms of their employment were governed by a collective bargaining contract between Mailers' Union and St. Louis Newspaper Publishers' Association. The association consists of the two corporations which publish the St. Louis Post-Dispatch and the St. Louis Globe-Democrat. The contract consisted of a preamble and sixteen articles relating to Jurisdiction, Hiring, Disputes and Discharges, Wages and Hours, Foremen, Priority, Military Service, Apprentices, Holidays, Vacations, Dismissal Pay, Jury Service-Voting Time—Funeral Pay, Sickness and Disability Benefits, and other miscellaneous matters.

We are particularly concerned with Article XI, Dismissal Pay:

"1. Any employe who has had a regular situation for more than one year who is laid off to reduce the force shall receive dismissal pay on the basis of one week's pay for each year of continuous priority.

"2. In the event of merger, consolidation or permanent suspension of publication by any newspaper covered by this con-

tract, all employes who lose employment thereby shall receive severance pay as follows:

"(a) Employes having six months priority standing, six (6) weeks' pay.

"(b) Employes having one year or more priority standing, twelve (12) weeks' pay.

"3. Such dismissal pay or severance pay shall be at the employe's regular straight time rate of pay. Priority standing shall be as recorded on the books of chapel officers and the books of the Publishers at the time of such lay off, suspension, merger or consolidation."

Other provisions should be particularly noted.

Paragraph 6 of the Preamble provides that the refusal of employes to cross a picket line where a strike sanction has been issued by International Typographical Union does not constitute breach of contract, and shall not affect employes' accrued benefits and rights (except the employe would not be paid for time lost as a result of his refusal to cross a picket line).

Paragraph 8 of the Preamble provides: "All wages, vacation credits and severance pay credits shall be considered as an earned equity and shall have prior claim in the event of merger, permanent suspension or liquidation. The cash equivalent of any such earned equity shall be paid immediately upon any employe's severance of employment as a result of such merger, permanent suspension or liquidation."

Paragraph 7, Article IV states in dollars and cents what the "wages of all journeymen" shall be, on an hourly, daily and weekly basis.

On February 21, 1959, at about 2:30 a. m., a strike was begun by St. Louis Newspaper Guild, which was the bargaining representative of Globe-Democrat employees in editorial, business and maintenance classifications (not the bargaining representative of plaintiffs). A picket line was erected around the premises of Globe-Democrat from that time to the date of the settlement of the strike, May 27, 1959.

Plaintiffs refused to cross the picket line of the Guild, and none of the plaintiffs reported to Globe-Democrat for work from the time the picket line was put up.

All of the plaintiffs took employment elsewhere during the period between February 21 and June 1, 1959, when publication of Globe-Democrat was resumed following settlement of the Guild strike.

After February 27, 1959 the Mailers' Union "froze" the "priority board" at Post-Dispatch and members of the Mailers' Union taking employment at Post-Dispatch remained in the capacity of "extras" (not regular situation holders) and acquired no priority standing until some time after June 1, 1959. Their wage rates and conditions of employment at Post-Dispatch continued as set forth in the collective bargaining contract described above.

On February 27, 1959, the corporations which publish Globe-Democrat and Post-Dispatch entered into a contract by which Globe-Democrat sold its principal physical properties, subject to a temporary leaseback of business and editorial quarters, to Pulitzer Publishing Company, publisher of St. Louis Post-Dispatch, and by which Globe-Democrat was to be printed for this defendant by Pulitzer following the settlement of the strike. Pursuant to the contract Globe-Democrat executed a deed conveying to Pulitzer the building in which it had conducted its business and accounting offices, and a bill of sale to the bulk of its mechanical equipment, presses and machinery, including all of the equipment used by plaintiffs in their normal employment with Globe-Democrat. On February 27, 1959 the president and publisher of Globe-Democrat notified the representatives of all of the mechanical crafts, including plaintiffs' representatives, and mailed a letter to all employees, in part as follows:

"To effect greater economy and efficiency in mechanical operation, The Globe-Democrat today entered into an agreement with the St. Louis Post-Dispatch under which The Globe-Democrat will be printed by the Post-Dispatch, when and if the Guild strike is settled.

"The sale is of the physical property only. The editorial, advertising, circulation and business departments of the two newspapers will be entirely separate. The Globe-Democrat will continue as a completely independent newspaper in every sense of the word.

"The consolidation of mechanical operations between competing newspapers finds great precedent in many cities throughout America, * * * as the mechanical costs of publishing a daily newspaper continue to rise. * * *.

"This move is made necessary because of the demands of the St. Louis Newspaper Guild. * * *.

"Members of the mechanical unions will be employed on a priority basis in the consolidated mechanical operation. If they all cannot be employed, the dismissal provisions of the current mechanical contracts will apply. * * *."

Throughout the period of the strike Globe-Democrat maintained the status of plaintiffs under the Blue Cross-Blue Shield program and group life insurance program.

In the opinion of the business manager and publisher of Globe-Democrat it would have been possible, notwithstanding the strike, to have prepared for printing and to have published Globe-Democrat during the period February 21–27, 1959, using supervisory personnel not on strike for the production of news content and advertising copy, if enough of the employees, members of the mechanical crafts, had been willing to cross the picket line to do the necessary mechanical work, and after February 27, 1959 it would have been possible to have rented mechanical equipment at some other print shop in the St. Louis area and to have printed a much curtailed and limited edition of the paper, had enough members of the mechanical craft employees of Globe-Democrat been willing to do the mechanical work under such circumstances. Globe-Democrat would have published such a newspaper during the strike if it had been reasonably possible to do so. Efforts were made by the business manager of the newspaper to persuade certain of the unions to return their members to work during this period and as late as May, 1959, but since none of the employees would return to work, no concerted effort was made to rent such equipment, and none was rented.

At a hearing before the Unemployment Compensation Commission on May 18, 1959 the business manager of Globe-Democrat testified that the employer-employee relationship of the Mailers' Union members and Globe-Democrat in effect before February 21, 1959 had continued, without change, and that none of the employees had been suspended, laid off, or terminated since that date; that their job status and work rights had not been prejudiced; that there had been no violence or unlawful conduct, or any other basis for discharge; that none of them or their union representatives had notified Globe-Democrat that they had taken any steps to terminate the employer-employee relationship that existed prior to February 21, 1959.

On June 25, 1959 (following a hiatus of fourteen days caused by a strike of members of the Stereotypers' Union against Post-Dispatch) most of the plaintiffs became "situation holders" at Post-Dispatch under the same contract under which they had previously worked for Globe-Democrat. Those who did not obtain such positions could have done so if they had so wished.

At various dates between May 29 and August 29, 1959 Globe-Democrat received letters from counsel for each of plaintiffs making demand for payment of wages as provided by § 290.110, and letter of dismissal as provided by § 290.140, V.A.M.S. Each

such letter was answered by letter from Globe-Democrat stating that the addressee was employed as a mailer from the date he entered the employ until February 21, 1959 "when you failed to report to work. You have not reported for work since, and we understand you have taken employment at the Post-Dispatch. The right to benefits of severance pay and vacation pay, which you assert, are the subject of a pending arbitration with your union under Article III of the last current contract."

The data on each employee showing the amounts of the severance pay, vacation pay and penalty (60 days wages) due, if entitled to recover such items, was agreed upon.

On this appeal plaintiffs make three points.

■ Plaintiffs' first point raises the question whether *"the consolidation of Respondent's mechanical operations"* comes within the meaning of paragraph 2, Article XI, supra.

The trial court ruled that the language of paragraph 2 was unambiguous, clear and concise; that the proof showed no consolidation, i. e., no new corporation springing into existence to assume the liabilities of former corporations dissolved and ceasing to exist; that what happened was a "reduction of force by contracting out the mechanical end of the business," and that these facts were not subject to the strained construction that they constituted a "consolidation."

We restate the pertinent portion of paragraph 2: "In the event of merger, consolidation or permanent suspension of publication by any newspaper covered by this contract, all employes who lose employment thereby shall receive severance pay as follows: * * *."

The word "newspaper" obviously refers to the publishing company, and not to the publication. Plaintiffs seem to concede this by the use of the phraseology "consolidated with another publishing company" in paragraph 4 of their petition.

We are here concerned only with the word "consolidation" as used in paragraph 2, supra, for in the lower court plaintiffs frankly admitted that there had been no merger or permanent suspension of publication.

Plaintiffs contend that the consolidation of the mechanical operations of Globe-Democrat with those of Pulitzer Publishing Company, publisher of the Post-Dispatch, was such a "consolidation" and otherwise came within the coverage of the entire provision, when the contract as a whole is properly construed; that the words are not clear and unambiguous, as the trial court decided, but require construction. They say the court improperly relied upon abstract definitions to reach its result and failed to consider and apply the following rules: that the whole subject matter must be considered from end to end and from corner to corner as well as all terms of the contract, for one clause may modify, limit or illuminate the other; that the intention of the parties must be gathered from a consideration of all of the provisions; that greater regard is to be had to the clear intention of the parties than to any particular words they may have used in attempting to express that intent; that in ascertaining that intent the court should consider the relationship of the parties, the subject matter of the contract, the usages of the business, the surrounding facts and circumstances attending the execution of the contract and the apparent purpose which the parties were undertaking to accomplish. Applying these principles, for which plaintiffs cite numerous Missouri cases, plaintiffs contend this is not a contract between corporations with corporate ownership and control as its subject matter, but a collective bargaining agreement with an unincorporated association of employees the obvious purpose of which is to protect the employee against sudden loss of employment brought about by any business maneuver or manipulations it might undertake during the term of the agreement; that the obvious intention was to provide severance pay under *any*

circumstances which might cause severance of the employer-employee relation by impact of forces beyond his control. Plaintiffs say "It is patently impossible to anticipate and provide for, much less classify and describe, every *situation that can arise in* industrial management of a large corporation * * *. It is obvious from the language used both in the subject provision and in the related provision found in Paragraph (8), page 3, of the Preamble, that the parties were here attempting to cover every situation which might arise. The failure in an attempt to accomplish that which is virtually impossible does not alter the fact of the existence of an obvious intention to do so. * * * [H]ad the parties contemplated such a maneuver at the time the contract was executed, it would have been expressly provided for in the appropriate clause. * * * Such an obvious omission [to provide for a situation wherein all the jobs of a department are lost due to consolidation of that department with the like department of another corporation] in a contract may be supplied by implication. * * * [T]he parties intended to be controlled by the thought expressed rather than by the words employed to express it." Plaintiffs say that a consideration of Preamble, Paragraph 8, and of Paragraph (1) of Article XI, assists in the interpretation of Article XI, paragraph 2.

We are of the opinion that the language of paragraph 2 relating to "consolidation" is clear and unambiguous and capable of being enforced and given effect without resort to judicial construction to determine the intention of the parties; that paragraph 2 contemplates three possible, specifically defined and delimited situations in which Globe-Democrat Publishing Company, a corporation, might go out of business as the publisher of a newspaper; that the word "consolidation" refers to consolidation of corporations, not to consolidation of the mechanical operations or of any department or partial function of Globe-Democrat; that no consolidation within the plain mean-

ing of paragraph 2 was shown by the evidence to have occurred; that the facts do not fit any of the three situations contemplated, and therefore plaintiffs' rights to severance pay under the contract have not been established. Where the issue has been so raised as to call for judicial construction of the language of paragraph 2 the same result is reached. Ackerman v. Globe-Democrat Publishing Co. (St. Louis), Mo., 368 S.W.2d 469; Allen v. Globe-Democrat Publishing Co. (St. Louis), Mo., 368 S.W.2d 460. No considerations advanced here invalidate the conclusions reached in those cases.

■ The sum and substance of plaintiffs' argument is that although the drafters of the contract failed to provide for the contingency that actually happened, the omission was obvious, and this Court should add a new provision, by implication, providing for severance pay upon loss of employment *under any circumstances which cause the severance of the employer-employee relation, as a result of forces beyond the employee's control.* This Court has no such power in this action. The courts cannot make contracts for litigants, Meyer v. Christopher, 176 Mo. 580, 594, 75 S.W. 750, 754, or rewrite contracts by judicial interpretation. Globe-Democrat Publishing Co. v. Industrial Commission, Mo.App., 301 S.W.2d 846, 851(2). This is not a suit to reform a contract, but an action to recover under the terms of a contract. Plaintiffs must prevail, if at all, upon the basis of the contractual provisions written into the contract. Our function is to determine what the parties intended by what they said, and we cannot be concerned with what they may have intended to say. Chater v. Carter, 238 U.S. 572, 584, 35 S.Ct. 859, 863, 59 L.Ed. 1462. Their intention must be gathered *from the language used in the contract.* Strauss v. J. C. Nichols Land Co., 327 Mo. 205, 211, 212, 37 S.W.2d 505, 508(2). That language fails to make provision for severance pay under the stipulated facts.

Plaintiffs' second point—that "[t]he Employees 'Lost Employment' as a result of the consolidation of the mechanical operations of Respondent"—is not sufficient to raise any question for appellate review because it fails to state what actions or ruling of the court are claimed to be erroneous and why it is contended the court was wrong in any action or ruling. It is an abstract statement not shown to be related to any action or ruling of the court. It violates Supreme Court Rule 83.05(e).

Nevertheless we point out that even though plaintiffs lost employment as a result of the sale of the physical plant and printing equipment of Globe-Democrat and the execution of the printing contract with Post-Dispatch, proof of these facts would not entitle plaintiffs to severance pay, since such loss of employment was not included in any of the contingencies provided for in the contract: merger, consolidation or permanent suspension of publication. Only loss of employment "thereby" would have entitled plaintiffs to severance pay. Plaintiffs having admitted there was no merger or permanent suspension of publication, and this Court having found there was no consolidation, there was no contractual liability for severance pay on the basis of loss employment from any *other* cause.

Plaintiffs' third point is that the trial court erred in its refusal to award appellants the penalty payments provided by § 290.110, V.A.M.S., for unlawful withholding of wages in violation of the statute, because vacation and severance pay are wages in fact and in law, under the contract, and under the statute.

Section 290.110 provides: "Whenever any corporation doing business in this state shall discharge, with or without cause, or refuse to further employ any servant or employee thereof, the unpaid wages of any such servant or employee then earned at the contract rate, without abatement or deduction, shall be and become due and payable on the day of such discharge or refusal to longer employ; and such servant or employee may request in writing of his foreman or the keeper of his time to have the money due him, or a valid check therefor, sent to any station or office where a regular agent is kept; and if the money aforesaid, or a valid check therefor, does not reach such station or office within seven days from the date it is so requested, then as a penalty for such nonpayment the wages of such servant or employee shall continue from the date of the discharge or refusal to further employ, at the same rate until paid; provided, such wages shall not continue more than sixty days, unless an action therefor shall be commenced within that time."

Since no severance pay was due, we confine ourselves to the question whether vacation pay was unlawfully withheld in violation of § 290.110. This section is penal in character, Durant v. Industrial Products Mfg. Co., 241 Mo.App. 266, 235 S.W.2d 574; Quinn v. T. M. Sayman Products Co., Mo.App., 296 S.W. 198, and is to be strictly construed.

Unpaid vacation pay under the collective bargaining contract did not constitute "unpaid wages * * * then earned at the contract rate," within the meaning of § 290.110. Neither Article X, Vacations, nor any other provision of the contract, classifies pay for vacations as wages, expressly or by implication. On the contrary, other provisions clearly indicate that it was not within the contemplation of the parties that vacation pay be regarded as the equivalent of or included as a part of an employee's wages. Wages and vacation credits are treated as separate and distinct in Paragraph 8 of the Preamble, wherein "All wages, vacation credits and severance pay" are referred to as an earned equity. In the separate Article IV, dealing specifically with the subject Wages and Hours, no reference is made to vacation pay but there is a definite provision that "the wages of all journeymen * * * shall be" a specified, certain number of dollars and

cents, listed at day and night rates by the hour and at certain amounts in dollars and cents per day and per week. Overtime rates are prescribed at price and one half of the "regular hourly rate." "All wages" are agreed *to be paid weekly in cash or current funds.* "The wage rates" contained in that article are agreed to be minimum rates, and provision is made that "compensation shall be on a time basis." We conclude from a reading of the entire contract that the parties differentiated between vacation pay and wage pay; that by agreement of the parties they are not one and the same; that the statutory words "unpaid wages * * * then earned at the contract rate" under *this* contract apply only to the wage rates prescribed in Article IV and have no application to vacation pay credits reserved therein; that "wages * * earned at the contract rate" under § 290.110 refer to the basic rate of pay, People v. Vetri, 309 N.Y. 401, 131 N.E.2d 568, 571, i. e., wage payments due and payable at regular intervals, Conlon-Moore Corporation v. Johnston, 23 Ill.2d 341, 178 N.E.2d 336, and have no reference to vacation credits calculated on the basis of priority, number of days worked during the preceding calendar year, and payable only once and in one sum.

Although for the purpose of giving priority to wage earners over other creditors under the Bankruptcy Act, § 64, sub. a, par. (2), 11 U.S.C.A. § 104, sub. a, par. (2), it has been held that vacation pay constitutes "wages" as that term is used in that Act, In re Public Ledger, Inc., 3 Cir., 161 F.2d 762; In re Wil-Low Cafeterias, Inc., 2 Cir., 111 F.2d 429, these are cases in which no penalty is involved, and their holdings may not be extended to cases involving a penal provision such as § 290.110. Furthermore, in the Public Ledger and Wil-Low Cafeterias cases it does not appear that the contract defined wages in the limited way "wages" are defined in the instant contract, or by implication excluded vacation pay from the definition of wages.

Finally, plaintiffs' requests for payment under § 290.110 were not timely. While the time within which request for unpaid wages shall be made is not stated it is clear by necessary implication that the request must be made within a short time after discharge. One of the objects of the statute is to effect a quick payment to the wage earner of wages due and unpaid at time of discharge. By the proviso it is contemplated that unless *actions* for the prescribed penalty be commenced within sixty days from date of discharge or refusal to further employ, the penalty of continuing wages will not continue more than sixty days. While request for unpaid wages need not be made immediately after discharge, it must be made within a reasonable time. Every request in the instant case was made at least ninety days after date of discharge, and in some cases as much as one hundred eighty days thereafter. Having in mind the objects and purposes of the statute, and the sixty-day limitation on actions, we rule that ninety days is an unreasonable length of time within which to make request for unpaid wages under § 290.110 and therefore plaintiffs' requests came too late.

The judgment should be affirmed, and it is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.

On Motion for Rehearing or to Transfer to Court En Banc.

PER CURIAM.

In their motion for rehearing or to transfer to the court en banc appellants contend, for the first time, that a federal question is involved, and that this case should be governed by the federal common law or federal substantive labor law, in the inter-

est of industrial peace. The *per curiam* opinions this day filed in Ackerman v. Globe-Democrat Publishing Co., Mo., 368 S.W.2d 469, and Irwin v. Globe-Democrat Publishing Co., Mo., 368 S.W.2d 452, dispose of these contentions adversely to appellants.

 Appellants further contend that our construction of the word "consolidation" contradicts the clear intention of the parties as expressed in the same clause of the contract. This constitutes mere reargument of one of the issues determined by the opinion, and under Supreme Court Rule 83.16, V.A.M.R. is to be disregarded.

The motion for rehearing or to transfer is overruled.