**In re MIAMI GENERAL HOSPITAL INC., a Florida corporation, f/k/a Associated Doctors' Hospital, Inc., d/b/a International Hospital, Debtor.**

**Bankruptcy No. 87–02131–BKC–AJC.**

United States Bankruptcy Court,
S.D. Florida.

July 14, 1988.

Robert Soriano, Tampa, Fla., for First American Bank and Trust.

Joseph A. Gassen, Miami, Fla., for trustee, Gui Govaert.

Jose I. Astigarraga, Miami, Fla., for Silvia Romero.

## ORDER GRANTING MOTION TO COMPEL PAYMENT OF ADMINISTRATIVE EXPENSE

A. JAY CRISTOL, Bankruptcy Judge.

THIS CAUSE came before the Court on January 12, 1988, and April 20, 1988 on the motion of Silvia Romero ("Romero") to compel the payment of administrative expense. The Court heard testimony from various witnesses, including Romero, Robert Sucher, Veronica Sammy, Vera Lee Mitchell Foster, Trustee Gui Govaert, and by deposition, Marta Prado. The Court has considered the evidence, heard argument of counsel, and is otherwise fully advised in the premises. For the reasons set forth below, the Court grants the motion.

### The Basis of the Motion

For the most part, the facts are not controverted. Romero was employed as a top financial officer of the debtor Miami General Hospital, Inc. (hereinafter, "MGH, Inc.") pursuant to an employment contract dated January 8, 1986. Under the terms of that contract, MGH, Inc., reserved the right to terminate her employment with or without cause; if her employment was terminated "at any time, for other than cause," then she was entitled to be paid severance pay. Exhibit 1. A petition was filed against MGH, Inc., on June 16, 1987, and thereafter, the Trustee was appointed. Romero claims her employment was later terminated and that therefore she is now entitled to her severance pay. She seeks to compel payment of such severance pay as an administrative expense. The Trustee and First American Bank and Trust Company ("FABT"), an interested party, concede the existence of the contract but dispute that she was terminated. As set forth below, the Court finds that she was in fact terminated.

### The Events Leading to Termination

MGH, Inc. owned a hospital facility in Miami, Florida. As of early June, 1987, MGH, Inc. employed more than 500 employees, including Romero, at the facility. In May or early June of 1987, International Medical Centers, Inc., which owned 100% of the stock of MGH, Inc., went into receivership. As part of that receivership, the State of Florida Department of Insurance asked Marta Prado, a senior officer with Emergency Medical Services and Associates, Inc., ("EMSA") to administer the af-

fairs of MGH, Inc., because the corporation's top management had departed. Shortly after Prado took over the administration, the State announced that it would cease funding the operations of the hospital as of the end of the month of June. An involuntary petition was filed against MGH, Inc. by a number of creditors. After the petition was filed, Prado continued to run the hospital. At the time, Romero was a senior officer of MGH, Inc.

Pursuant to that petition, this Court appointed Gui Govaert as Trustee in open court on June 26, 1987, and thereafter made that appointment effective July 1, 1987. By order of Court, the Trustee was empowered and directed to operate the debtor's business.

In the course of his duties, the Trustee retained Marta Prado as administrator of the hospital. Together they reviewed the roll of the 500–plus employees to determine who would be kept. The Trustee determined that he would keep only the minimum number of employees necessary to keep the hospital open. Upon commencement of his administration, the Trustee retained only 70 of the approximately 570 persons employed as of late June. Romero was one of the 70. The Trustee was specifically aware of Romero and consciously decided to retain her because he needed her knowledge with respect to hospital operations and its financial affairs. (T. I–15).[1]

Thereafter, pursuant to order of Court, the hospital facility, together with the improvements, fixtures and equipment owned by MGH, Inc., were sold to FABT. The sale was confirmed as of 11:00 p.m., July 9, 1987. That afternoon, a meeting was convened at Prado's office. Present were Prado, the Trustee, and Romero, among others. At the meeting, the Trustee and his administrator, Prado, discussed the status of the employees upon the sale of the hospital facility. The Trustee and Prado agreed that all employees would be termi-

nated effective as of 11:00 p.m. on Thursday, July 9th. (T. I–52, 54, 81–84.) Pursuant to that decision, all employees were advised by memorandum that effective 11:00 p.m., July 9th, they had all been terminated by MGH, Inc.

There is no dispute that Romero was not employed by MGH, Inc. after July 9th. Termination papers were processed for each of the employees, including the standard Personnel Action Record forms. The Director of Personnel, Veronica Sammy, prepared such forms for each employee. A final W–2 form reflecting the compensation paid to employees by MGH, Inc., through July 9th was prepared. The Trustee himself testified that as of July 9th, MGH, Inc., had 70 employees, and that as of July 10th it had none.

On July 10, FABT, through its wholly-owned subsidiary, GH Corporation of Miami, began its operation of the hospital facility. A meeting of the employees was convened. Prado, Romero and FABT officer Sucher, among others, were present. The person in charge for GH Corporation advised the employees that GH Corporation would be hiring them on a per-day basis. The employees were told that GH Corporation would not be assuming any of the benefits that the employees had accumulated while employed by MGH, Inc., and that they would all be hired as temporary employees with no benefits. Both witness Vera Foster and the claimant Romero testified that all the employees were informed that they were terminated as employees of MGH, Inc. The employees were specifically told that they no longer were employed by MGH, Inc. [T. II–28.] The employees were advised that they would have to fill out new W–2 forms. As well, the employees were advised that they would have to fill out new I–9 governmental forms.[2]

The parties have stipulated that effective 11:00 p.m. July 9, G.H. Corporation took over the operation and management of the

---

1. "(T.I–15)" refers to page 15 of Volume I of the Transcript of the proceedings. Volume I is the transcript of hearing of January 12th, and Volume II is the transcript of the April 20th hearing.

2. I–9 Forms are government forms verifying immigration status and eligibility to work which must be filled out whenever an employer hires a new employee.

hospital and hired the employees that had been employed by the Debtor, MGH, Inc., and that as of that time MGH, Inc., ceased employing those individuals. (T. I–100) GH Corporation obtained a new tax employer identification number effective July 9. After that date, neither MGH, Inc. nor the Trustee paid any further wages or salaries to anyone, and GH Corporation commenced paying the salary and wages of its new employees.

### The Termination Issue

■ FABT and the Trustee contend that Romero was not terminated, arguing that "although the entity which paid the Movant [Romero] may have changed, Movant has never, in fact, been terminated from her position as Director of Finance of the Hospital."[3] On its face, that argument is unsound. Romero was not employed by a "hospital." A hospital is a building, a health care facility. Romero had a contract of employment with MGH, Inc. There is no question that her relationship with MGH, Inc. was severed on July 9, 1987, and that after that date she had no further rights against, or dealings with, that employer. Once it is conceded that the entity has changed, then by definition the employment relationship with the former entity has terminated. The fact that Romero was hired by the new buyer of the hospital does not alter the fact that her employment relationship with MGH, Inc., was severed.

Numerous cases have defined the concept of a "termination of employment." In *Pan American Life Insurance Co. v. Garrett,*[4] the employer operated a transportation system in El Paso. That employer sold the entire system to a new corporation. The new corporation hired all of the employees, who continued to perform the same duties and to receive the same compensation as before the sale. The Court held that a termination of employment had occurred, declaring:

That no such relationship [of employment] could exist between appellees and Electric Company [the former employer] after the Electric Company had sold its transportation system to El Paso City Lines, Inc., a distinct and separate legal entity by which plaintiffs were thereafter employed is apparent.

199 S.W.2d at 822.

In *In Re Public Ledger, Inc.,* 161 F.2d 762 (3d Cir.1947), the Third Circuit ruled that a cessation of employment by reason of a sale of assets constituted a discharge. *Id.* at 772. That discharge entitled the employees to severance pay.

■ In *Salvatori Corp. v. Rubin,* 159 Ga.App. 369, 283 S.E.2d 326 (1981), the plaintiff left employment by Swank to work for the defendant. The plaintiff was employed by the defendant pursuant to a contract which provided that "should [he] be terminated by the company, the company agreed to pay six (6) months severance on a regular monthly basis." 283 S.E.2d 326, 329. Immediately upon being discharged by defendant, the plaintiff returned to Swank without any loss of work. Among other things, the defendants argued that the plaintiff had not suffered any loss of employment, and therefore was not entitled to any severance pay. The Court ruled that if termination had occurred, the right to six months severance was absolute, and was not affected by the fact that the plaintiff had obtained other employment. *Id.* at 330. Here, the fact that Romero obtained other employment with GH Corporation does not affect her entitlement to her severance pay either.

Moreover, the evidence is clear that Romero's relationship with GH Corporation was quite different from her employment relationship with MGH, Inc. FABT and the Trustee argue that since her base pay remained the same, her employment was in fact continued. It is not enough, however, to simply look at base pay.

---

3. Brief in Support of First American Bank & Trust's Response in Opposition to Motion to Compel Payment of Administrative Expense, page 3. In actuality, Romero has not been

employed at the hospital since before the April 12th hearing.

4. 199 S.W.2d 819 (Tex.Civ.App.1946).

Romero was one of the senior officers of the hospital. Her employment contract included an entire package of executive compensation benefits, which GH Corporation did not accept when it hired Romero. When hired by MGH, Inc., Romero specifically negotiated medical coverage for a knee injury her son had suffered. Her contract specifically provided that MGH, Inc. would cover her son's medical bills for any physician Romero might select. Her contract specifically provided for four weeks' paid vacation, life insurance, paid holidays, sick leave, and the payment of professional association dues and seminars, among other things.

When GH Corporation hired her, it paid Romero the same base salary, but did not cover the medical bills for her son's knee injury, paid no long-term disability coverage, paid no life insurance coverage, did not pay any of Romero's dues, did not pay any of her professional fees, granted no sick leave, granted no holidays and no vacation.

It is clear that although her base salary remained the same, Romero was not employed by GH Corporation on the same terms that MGH, Inc. employed her. Especially in today's world of executive compensation, where often the base salary is only one component of a compensation package, it is unsound to argue that an employment relationship continues intact where the employee has lost an entire array of benefits and executive "perks" she enjoyed.

The Court finds and concludes that under Romero's contract, her employment was terminated on July 9, 1987.

*Romero's Entitlement to Severance Pay*

■ There is no dispute that the Trustee continued to employ Romero through July 9th. The Trustee has testified that he consciously decided to retain Romero as he needed her knowledge with respect to hospital operations and financial affairs. [T. I–15].

It is clear that "when necessary, the Trustee, in an effort to preserve the estate, or the debtor-in-possession as an incident of the operation of the business, may hire labor including the debtor's former personnel and the debtor himself. The expenses for the compensation to such employees of the Trustee or the debtor-in-possession are expressly entitled to priority under section 503(b)(1)(A) as among the actual necessary costs and expenses of preserving the estate." Collier on Bankruptcy § 503.04[1][a][iii] at 503–28 (1988 Ed.) The courts have recognized the existence of two types of severance pay: (1) pay at termination in lieu of notice, and (2) pay at termination based on length of employment. *Matter of Health Maintenance Foundation*, 680 F.2d 619, 621 (9th Cir. 1982). The courts have uniformly held that the first type of severance pay is entitled to priority payment as a cost of administration. See 3 Collier on Bankruptcy, § 503.04[1][a][iii] at 503–29, n. 32 (1988 Ed.). With respect to "in-lieu-of-notice" severance pay, the "presumption is that the Trustee chose to terminate the employee without notice as part of administering the Chapter 11 reorganization, and the severance pay in lieu of notice is therefore considered a cost of administration." *Matter of Health Maintenance Foundation*, 680 F.2d at 621.

Careful analysis of the cases shows that the only split of authority has occurred with respect to severance pay based on length of service. The First, Third and Ninth Circuits have held that severance pay based on seniority is not entitled to priority as a cost of administration,[5] whereas the Second Circuit has held that it is. *Straus–Duparquet, Inc. v. Local No. 3 Int. Bro. of Elec. Wkrs.*, 386 F.2d 649, 651 (2d Cir.1967).

Until she was terminated, Romero performed her duties under her employment contract, which specifically provided that if she was terminated, at any time, for other than cause,[6] she would be entitled to sever-

5. *In re Mammoth Mart, Inc.*, 536 F.2d 950, 955 (1st Cir.1976); *In re Public Ledger, Inc.*, 161 F.2d 762 (3d Cir.1947); *Matter of Health Maintenance Foundation*, 680 F.2d 619, 621 (9th Cir.1982).

6. The parties have stipulated that Romero was

ance pay. By its terms, the severance pay provision became effective when the contract was signed, January 8, 1986. Unlike other terms of her contract, the severance pay provision did not require any period of service before vesting. For example, to earn her paid vacation, Romero had to serve first a year of employment.

Romero's severance pay, then, was not based on length of service. Unlike seniority-based severance provisions, such as those found in *Mammoth Mart* under which the amount of severance pay increases the longer the employee works for the company, Romero's severance benefit was effective immediately upon employment, and did not increase the longer she worked. On its face, the contract provided severance pay in lieu of notice.

The cases uniformly hold that severance pay which is not based on length of service is compensation for termination of employment; where employment is terminated as an incident of the administration of the estate, severance pay is an expense of administration and is entitled to priority as such an expense. *Straus–Duparquet, Inc. v. Local No. 3 Int. Bro. of Elec. Wkrs.*, 386 F.2d 649 (2d Cir.1967).

### The Effect of Rejection

FABT and the Trustee further argue that Romero's contract was rejected pursuant to 11 U.S.C. § 365, converting Romero's claim into a pre-petition general unsecured claim under the terms of 11 U.S.C. § 365(g). Under the facts of this case, that argument is not well founded.

The sequence of events is important to resolving this issue. The Trustee was appointed in late June. As part of his administration of the estate, he retained Romero as an employee. Romero was terminated on July 9, thereupon earning her entitlement to the severance pay. In August, as part of the sale of the estate assets, the Trustee filed a comprehensive motion seeking to assume certain contracts and reject others. The Trustee moved to reject

Romero's contract on August 31, 1987. On September 10, 1987, the Court held a hearing on the Trustee's motions to reject contracts, including Romero's. Romero appeared at that hearing seeking to reserve her rights under her employment contract and advised the Court that the Trustee had already terminated her employment as of July 9, 1987. The Court's order granted the Trustee's motion to reject the executory contracts listed, including Romero's, "except as otherwise provided in the order." The order specifically provided that nothing therein was intended to preclude Romero from bringing any proceeding to determine her rights. That order of September 10th was entered without prejudice to Romero's rights to seek payment of her severance pay.

Moreover, the cases have uniformly held that a motion to reject the contract puts an employee on notice prospectively, but will not operate to deprive an employee of compensation he has fairly earned before getting notice of the rejection. *Matter of Tucson Yellow Cab Co., Inc.*, 789 F.2d 701 (9th Cir.1986); *In re Northwest Engineering Co.*, 43 B.R. 603 (Bkrtcy.E.D.Wis.1984).

Both *Northwest Engineering* and *Tucson Yellow Cab* are instructive.

In *Northwest Engineering*, the debtor had a severance pay policy in effect when the Chapter 11 petition was filed on April 1, 1983. A number of the employees continued to work for the debtor. They were terminated on December 12, 1983. In April of 1984, a motion was filed seeking to reject the severance pay policy as an executory contract. The Court held that the April 1984, motion to reject would serve as notice to employees then serving that the policy would no longer be in effect, but that this would not affect the rights of those claimants whose services had been terminated in December of 1983. The Court observed that the employees had not been notified in April 1983, when the Chapter 11 petition was filed, that the policy with respect to severance pay was being

not terminated for cause. (T.I–73.)

terminated.[7] Thus, the motion to reject did not vitiate the employees' right to severance pay that had accrued before the motion to reject was filed.

*Tucson Yellow Cab* is also on point. In that case, the employer had a contract in place, with a severance pay provision. In January of 1981, a Chapter 11 petition was filed. Thereafter, a motion to reject the contract was filed. On April 5, 1982, an order approving the rejection was entered. A week later, the debtor's assets were sold, and four days thereafter, all the employees were terminated. The employees sought payment of the severance pay. In a detailed opinion, the Court noted that while the decision to assume or reject was pending, the employees' wages included severance pay. Therefore, reasoned the Court, had the employees been terminated on April 4th, before the order granting rejection was entered, the employees would have been entitled to payment of their severance pay as an administrative expense.[8]

However, the Tucson Yellow Cab contract had been rejected before termination. Therefore, the contract of employment containing the severance pay provision was not in effect on April 16th, the date of the termination. The Court concluded that the employees were nevertheless entitled to payment of their severance payment. The Court reasoned that under *Bildisco*,[9] a contract not assumed with the court's approval remained open to rejection even though it had been performed by both sides for months. Under *Bildisco*, however, the rejected contract was determined to be a fair measure of the value of the services rendered by the employees during the period preceding rejection. Since the fair value of the employees' services before rejection of the contract included severance pay (under their contract), the Court found no reason to value the last 11 days of their service, from April 5th to April 16th, any differently. Accordingly, even though the contract

had been rejected on April 5th, the Court concluded that on a quantum meruit basis, the employees were entitled to the payment of their severance pay as a cost of administration by virtue of their termination on April 16th.

In reaching that conclusion, the Court rejected the argument that the employees were owed no more than their weekly wages. The Court reasoned that if for over 14 months the fair value of those services was the amount set by the contract which included not only wages but severance pay as well, no reason appeared why the work of the last 11 days should be valued at a lower figure. Thus, the Court rejected the same arguments which FABT and the Trustee make here. Before the petition Romero's pay included severance benefits, not just salary. The Trustee and FABT have not shown any reason why the fair value of Romero's work during the administration of the estate was different from the value of her work before administration. Accordingly, the Court finds that the fair value of Romero's services did not change upon the filing of the petition and therefore that her compensation upon termination included severance benefits.

The *Tucson Yellow Cab* case has some other interesting parallels to the case at bar. The Tucson Yellow Cab Company employees were found to be entitled to severance pay even though they had all been immediately re-hired by the new owner of the business, just as GH Corporation hired MGH, Inc.'s terminated employees. The rehiring by the new cab company did not result in there not being a "termination" by the old cab company.

Also, FABT and the Trustee have argued that the equities are not with Romero, and that on a relative scale she is better off than most creditors. In *Tucson Yellow Cab*, the rival parties were the employees on the one hand and a seriously injured tort victim on the other. The granting of statutory priority to the em-

---

7. Similarly, here, at no point did the Trustee or FABT advise Romero that the terms of her retention were different from those which had been in effect when she commenced her employment with MGH, Inc.

8. This is exactly Romero's situation—she was terminated before the motion or order of rejection.

9. *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 526, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984).

ployees' claim for severance pay had the effect of depriving the tort victim of any significant recovery for her serious injuries. The Court granted the employees severance pay, even though the employees worked only 11 days after the April 5th rejection and even though they knew that their discharge was inevitable. The Court ruled that principles of equity had to operate within the boundary set by statute, and that the statute granted priority to severance pay claims. Therefore, the employees were entitled to collect their severance pay as a cost of administering the estate, despite the equitable arguments.

In this case, the equities are in fact with Romero. As noted in this Court's earlier orders, there existed a genuine emergency situation in June 1987. At the time, the State of Florida was about to cease funding of the hospital as of June 29, 1987, and the hospital was without funds to continue to operate. The license of the hospital was about to expire on June 30th, unless renewed by the State. The best interest of the creditors would be served if the hospital could be sold as a going concern. For that reason, the continued operation of the hospital was vital to the interest of the estate and the creditors.[10]

When the Trustee took over, Romero was the only top administrator of the pre-petition management team that remained at the hospital. The state of financial affairs at the hospital in late June was not good. The books for the period ending March 31, 1987, had not been closed. The auditors had not come because the State had taken over. A number of governmental reports that had to be filed with regulatory agencies had not been filed. When the State departed, it took many of the records. Romero was the person at the hospital who had the knowledge necessary to file the reports.

In the Trustee's own words, Romero was "extremely valuable, especially in connection with her knowledge of the whole operation" and he considered her "an essential element to him in the organization and in keeping the hospital going." [T. I–115.]

During the Trustee's administration, Romero filed numerous reports for the Trustee, including Medicare and Cost Containment Board reports and extension requests, all of which were required in order to keep the hospital in good standing. Romero also met with prospective buyers to provide them with financial information relating to the hospital. Among other things, she reviewed the financial statements with each of the prospective buyers. In part due to Romero's continued cooperation and employment, the Trustee was able to sell the hospital as an ongoing entity. Thus, her services were of substantial benefit to the estate. The estate having benefited from her contract of employment, it would now be inequitable to repudiate now the terms of that contract by disregarding the express severance pay provision.

### The Implied Assumption Issue

■ Romero also argues in the alternative, that she is entitled to payment of her contractual severance benefits under the doctrine of implied assumption. Under that doctrine, which was sometimes used under the Bankruptcy Act, a contract was deemed to have been assumed by virtue of post-petition conduct. *See,* Broude, *Reorganizations Under Chapter 11 of the Bankruptcy Code,* § 6.05(5) at 6–35 (1987 ed.); see also *In Re Public Ledger, Inc.,* 161 F.2d at 762 (3d Cir.1947). A split of authority appears to exist as to the continued viability of this rule under the Bankruptcy Code: *Broude, id.* The Trustee and FABT argue that the Trustee is not empowered to assume a contract without an order of Court, and therefore that he cannot be estopped from rejecting the contract regardless of his post-petition conduct. Romero concedes that no contract may be assumed unless the Court so orders, but contends that the Court can enter its order decreeing assumption after the fact, if the trustee's post-petition conduct warrants it. Romero argues that although the Trustee's post-petition conduct cannot bind the Court, such conduct can bind the Trustee if the Court deems it appropriate; in effect, that

---

**10.** *See* Order to Sell Miami General Hospital; to Shorten Time for Notice of Sale; to Set Up Procedures for Objections to Sale; to Provide for Notice of Sale by Publication; to Set Up Terms for Bidding and the Sale; and to Set a Date for the Sale, dated July 1, 1987.

the Trustee cannot use the lack of Court approval as a shield for inequitable conduct.

There is support of Romero's position. *In The Matter of Reda, Inc.*, 54 B.R. 871 (Bkrtcy.N.D.Ill.1985), the claimant had an executory contract with the debtor when the Chapter 11 petition was filed. Thereafter, the claimant continued to perform its services under the contract, and upon completion sought a declaration that the contract had been assumed. The Court noted that an executory contract could not be assumed without court approval. However, finding that the claimant continued to perform services after the filing of the petition, and that the debtor knowingly and willingly accepted the benefits of the contract, the Court granted the claimant's request. The Court reasoned that it could either hold that the "debtor assumed this contract by its action and give its approval of that assumption *nunc pro tunc* or hold that the debtor is estopped to deny that it has assumed the contract." *Id.* at 880. The court adopted the former theory, and approved the assumption after the fact.

Similarly, in this case, the estate received the benefits of Romero's employment contract. Although that contract cannot be assumed without approval of the Court, the Court hereby grants approval *nunc pro tunc*. The Court further finds that as assumed, the contract was in effect on July 9th, when Romero was terminated, thereby entitling her to her severance benefits.

### Conclusion

Section 503(b), 11 U.S.C., provides that the "actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case" shall be allowed as administrative expenses. The courts have uniformly held that severance pay not based on length of employment constitutes wages or salary entitled to priority as administrative expenses. *Straus–Duparquet, supra; Mammoth Mart, supra; In Re Public Ledger, Inc.,* supra; *In Re Northwest Engineering*

Co., *supra*; and *Matter of Tucson Yellow Cab Co., Inc., supra.*

Accordingly, after due consideration, it is

ORDERED AND ADJUDGED that Romero's motion to compel payment of administrative expense be and the same is hereby granted. It is further

ORDERED AND ADJUDGED that Romero's claim for severance pay in the amount of $36,921.60 [11] be and the same is hereby allowed as an administrative expense under 11 U.S.C. § 503(b). It is further

ORDERED AND ADJUDGED that Romero's request for payment of administrative expense is hereby allowed as a first priority administrative expense under 11 U.S.C. § 507(a)(1).

---

**11.** Romero's base weekly salary was $1,538.40. Under her contract, Romero was entitled to 26 weeks of severance pay, but is claiming only 24 weeks, as she has been paid two weeks of that severance already.