SHIVERS, Judge.
Appellant United Industries Corporation, defendant in the trial court, appeals the entry of a directed verdict in favor of the appellee/plaintiff, Sharon Woods, in her action against United for payment of severance pay. We affirm the directed verdict.
The evidence .produced at trial established, without dispute, that Woods began working in July 1981 in the advertising *245 department of the Rid-A-Bug Company, predecessor to the Spectrum Group, Inc. Woods eventually became the company’s advertising director. On December 4, 1986, Chesebrough Ponds, Inc. purchased Spectrum and made it one of Cheseb-rough’s subsidiaries. Then, in 1987, Che-sebrough decided to sell Spectrum. To induce its employees to stay on while it attempted to find a purchaser, Spectrum’s president issued a written memorandum on October 26, 1987, offering its employees a “special incentive payment” equal to three months salary if the employee stayed with the company for at least 60 days after Spectrum was sold. The memo also contained the following statement regarding severance pay:
It is our intent to sell the Spectrum Group as a going business and as such we hope that employment opportunities for Spectrum employees will continue with the new owner. However, in the event of your termination for any reason other than cause, you shall be entitled to severance pay at the rate of two weeks for each year of service with the Company. To receive such severance, you must actually be terminated by the Company and in the case of a job elimination it would be necessary that you remain until you were actually released by the company-
On August 1, 1988, Chesebrough sold a portion of Spectrum’s assets to appellant, United and, in a written memo dated September 2, 1988, made the following announcement to all its personnel:
The Chesebrough severance program will remain in effect. If United Industries continues your present employment after September 30,1988, then we will be responsible for fulfilling that severance program. If United Industries terminates your present employment prior to October 1, 1988, then it is our understanding that Chesebrough will fulfill the severance program.
The purpose of this announcement is to inform you that you do not have to terminate your employment by quitting prior to October 1, 1988 in arder to have the benefit of the Chesebrough severance program since we are continuing that program in effect.
Woods continued working in her position with United until May 11, 1989, when she resigned to take a position with another company. She received the “Stay Pay” offered by Spectrum; however, on May 3, 1989, she demanded severance pay from United but was refused. She then filed suit against both Spectrum and United, eventually dismissing Spectrum with prejudice, and a jury trial was conducted on the remaining suit against United.
Woods presented testimony at trial that she was earning $27,000 a year from Spectrum at the time it was purchased by United and, while working for Spectrum, received an employee pension and profit-sharing plan, and benefitted from Spectrum’s sick leave policy. After the purchase, Woods received nothing in writing that told her what benefits she might receive from United. At the time of the asset purchase, she was required to complete an application and withholding information for United, which she stated was their normal procedure for hiring. It was undisputed that plaintiff suffered no interruption in work after the purchase by United, and had no change in title, pay, or work hours. Further, Gene Wagnon, her supervisor at Spectrum, remained Woods’ supervisor after the purchase.
However, Woods testified that her job duties did change after the sale. Specifically, several of her duties and responsibilities within the advertising department— including the ordering of supplies, material, literature, labels, cartons, the making of decisions and coordinating of commercials — were taken over by an advertising agency in St. Louis, where United’s headquarters were located. In the month following the purchase, the entire accounting and finance data processing offices were, according to Woods, removed from the Jacksonville office and relocated to St. Louis and, at some point after that, several other employees either had their positions eliminated or moved to St. Louis. Woods testified that, in January of 1989, Mr. Wag-non returned from a lengthy trip to United’s headquarters and, shortly thereafter, told her that she needed to update her *246 resume and find another job. Fearing that her position would soon be eliminated, Woods sent a memo to Wagnon on April 27, 1989, stating that she would be leaving the company.
Richard Bender, director of Personnel for United, testified at the trial that approximately 55 employees worked in the Jacksonville office of Spectrum at the time of its purchase by United. At the time of trial, only one (Gene Wagnon) was still with United, the remainder of the employees either having left the company or moved to St. Louis when their divisions were relocated. Bender agreed with Woods’ testimony that the employees who came to United from Spectrum on August 1, 1988 were required to complete employment documents and, when asked whether it would be fair to say that these employees had changed employers, Bender replied “Yes.”
The court granted plaintiffs motion for directed verdict, finding that, as a matter of law, plaintiff had been terminated by Spectrum on August 1, 1988 and, because she stayed with United until after October 1,1988, that United was responsible for the payment of severance benefits. In so ruling, the court relied on the holding in In re Miami General Hospital Inc., 89 B.R. 980 (Bkrtcy.S.D.Fla.1988), as well as a number of cases from other states. After the court had announced its ruling, counsel for United proffered that Gene Wagnon would have testified that he had no conversation in January of 1989 with Woods about updating her resume, and that he had no knowledge that United was planning to disintegrate or dissolve the Jacksonville office.
Woods was awarded $7,056 in the court’s final judgment, and United now appeals, arguing: (1) that the court erred in finding that plaintiff's job was terminated as of the date of the sale of Spectrum’s assets to United; and (2) that the trial court erred in construing the October 26, 1987 memo from Spectrum and the September 2, 1988 memo from United as entitling Woods to severance pay.
While there appear to be no Florida cases directly addressing the first issue raised by the appellant, we find that the cases argued at trial and relied upon by the trial court establish, as a matter of law, that United’s purchase of Spectrum’s assets on August 1,1988 constituted a termination of Woods’ employment.
In Miami General Hospital, supra, the employee (Romero) was hired in 1986 by Miami General Hospital (MGH) under a contract which stated that, if her employment were terminated “at any time, for other than cause,” she would be entitled to severance pay. On July 9, 1987, MGH was sold to a company known as FABT. The afternoon of the sale, the hospital’s trustee advised all employees that they had been terminated by MGH, and termination papers were processed for each employee. On July 10, 1987, the employees were advised by FABT that the new company would be hiring them on a per-day basis, as temporary employees with no benefits, and that they would be required to fill out new W-2 forms. Employee Romero later sought severance pay from MGH, but her claim was denied. The bankruptcy court held, in its written opinion:
There is no question that [Romero’s] relationship with MGH, Inc. was severed on July 9, 1987, and that after that date she had no further rights against, or dealings with, that employer. Once it is conceded that the entity has changed, then by definition the employment relationship with the former entity has terminated. The fact that Romero was hired by the new buyer of the hospital does not alter the fact that her employment relationship with MGH, Inc., was severed.
Numerous cases have defined the concept of a “termination of employment.” In Pan American Life Insurance Co. v. Garrett, [199 S.W.2d 819 (Tex.Civ.App. 1946)], the employer operated a transportation system in El Paso. That employer sold the entire system to a new corporation. The new corporation hired all of the employees, who continued to perform the same duties and to receive the same compensation as before the sale. The Count held that a termination of employment had occurred, declaring: *247 That no such relationship [of_ employment] could exist between appellees and Electric Company [the former employer] after the Electric Company had sold its transportation system to El Paso City Lines, Inc., a distinct and separate legal entity by which plaintiffs were thereafter employed is apparent.
199 S.W.2d at 822.
In In Re Public Ledger, Inc., 161 F.2d 762 (3d Cir.1947), the Third Circuit ruled that a cessation of employment by reason of a sale of assets constituted a discharge. Id. at 772. That discharge entitled the employees to severance pay.
89 B.R. at 983.
Although there is no evidence that employees in the instant case were specifically advised by Spectrum that they had been terminated on August 1, 1988, there is evidence, as in Miami General Hospital, that the plaintiff was rehired by United without being told whether she would receive her previous benefits, and that she and other employees were required to fill out new employment information, including W-2 forms.
Several cases from other jurisdictions also persuaded the trial court in the instant case to hold as it did. In Bolling v. Clevepak Corp., 20 Ohio App.3d 113, 484 N.E.2d 1367 (1984), the Ohio Court of Appeals held that the sale of Clevepak’s Sandusky, Ohio box plant to the PRT Corporation on August 31, 1983 constituted a “separation” from Clevepak and a “termination” of its employees, obligating claimant to pay severance benefits, even though the employees were hired by PRT and continued working there.
In Gerson v. Diamond Shamrock Corp., 710 S.W.2d 368 (Mo.App.1986), the Missouri Court of Appeals held that employees were entitled to severance pay under a personnel policy which provided severance pay “[w]here separation from employment is ... because of a permanent layoff due to lack of work ..., where the division in which the employees worked was sold to Monsanto, even though the employees were hired by Monsanto to do the same jobs that they had performed before. The court held:
The language concerned in the instant case shows employees were entitled to the severance pay. Sale of the division ended their connection with employer; there was no further work for them with employer. The sales, agreement between employer and Monsanto did not guarantee employees anything. If employees had not been offered jobs by the new owners, it is conceded they would have been entitled to severance pay under the plan. But, nothing in the language of the policy itself distinguishes the case where they are offered employment with the new owner from the case where they are not offered such employment. We conclude there is no reason under the language of the policy to deny employees the severance pay.
710 S.W.2d at 369-370.
Further, in Demerath v. Nestle Co., Inc., 358 N.W.2d 541 (Wis.App.1984), the Nestle Co.’s personnel policy offered to pay severance benefits to employees who were involuntarily terminated through (1) the closing of a plant; (2) the elimination of an employee’s position; (3) substandard work; or (4) an inability of the employee to get along with associates. Nestle subsequently sold its White Clover Dairy operation to an independent corporate entity and its employees were immediately hired by the plant’s new owners to substantially equivalent positions at the same salary. Several employees claimed entitlement to severance pay under the personnel policy, and Nestle refused. Although the trial court granted summary judgment in Nestle’s favor, the appellate court reversed, granting summary judgment in the employees’ favor, and holding:
First, the employees were terminated as Nestle employees when the plant was sold. When part or all of a company is sold and the employees are told that they cannot remain with their old employer, their employment has been terminated even though they immediately begin to work for the new owner. Dahl v. Brunswick Corp., 277 Md. 471, 356 A.2d 221, 225 (1976). The sale ended Nestle’s involvement with the employees. *248 This is not a situation where Nestle remained in contact with the employees either through a corporate merger or because the sale involved Nestle’s acquisition by a purchaser. The White Clover Dairy was sold to an independent corporate entity. The termination was also involuntary in that no employee was given the option of remaining with Nestle. The remaining question is whether the involuntary termination involved one or more of these four circumstances.
By selling the plant, Nestle eliminated the employees’ positions. Nestle permanently terminated its relationship with the employees and, at the same time, eliminated the employee’s positions. The positions once occupied by the employees no longer exist in the company. Nestle argues, however, that the employees’ positions still exist under the new employer. Nestle incorrectly looks at events occurring subsequent to its elimination of the positions. The new employer was under no duty to maintain any positions at the plant and chose not to create some of the positions. That the new employer chose to hire some Nestle employees for identical positions does not alter the conclusion that Nestle’s actions were within the policy’s terms. The former Nestle employees became new employees in new positions in a new company. There is no guarantee that the new employer will offer the same job security, benefits, or contract rights.
[[Image here]]
Nestle may not avoid its contractual obligations merely because it would be unjust to require payments when the former employees continue in the same jobs, at the same plant, on the day after the sale, thereby suffering no period of unemployment. While one purpose of severance pay is to alleviate the consequent need for economic readjustment, ... economic need is immaterial if the contract provides for severance pay regardless of the existence or nonexistence of economic need. Willets v. Emhart Manufacturing Co., 152 Conn. 487, 208 A.2d 546, 548 (1965); Adams v. Jersey Central Power and Light Co., 21 N.J. 8, 120 A.2d 737, 740 (1956). Severance pay may, and frequently does, exist where there is no interruption whatever in the continuity of employment. Willets, 208 A.2d at 548. The contractual terms control.
358 N.W.2d at 543-544 (emphasis supplied).
Although United argues on appeal that the trial court’s decision should have been controlled by Bradshaw v. Pantry Pride Enterprises, Inc., 566 So.2d 1306 (Fla. 3d DCA 1990), we find that decision to be distinguishable from the instant case. In Bradshaw, appellee Pantry Pride began in 1983 to sell its distribution warehouses in Jacksonville and Miami. Each of the plaintiffs, 35 former mid-level managers of Pantry Pride divisions, were hired by the purchasers with almost identical job duties and compensation, and with no interruption in employment. The plaintiffs then claimed severance pay under a 1976 Pantry Pride policy which stated that “[t]he Company will pay severance pay on a weekly basis to eligible management personnel affected by the closing of a plant or department and who remain actively at work through the date set by the Company_” Id. at 1307. Pantry Pride denied the claim for benefits, the trial court granted summary judgment in Pantry Pride’s favor, and the appellate court affirmed, holding:
the employees ... are not entitled to severance pay by the plain terms of the policy statement which they seek to enforce. The 1976 policy grants severance pay to certain employees “affected by the closing of a plant or department....” Here, there was no such closing. Instead, there was a complete sale of divisions of Pantry Pride, and each employee, without any interruption in employment simply continued at his or her former job, albeit with a successor employer. ... Although Pantry Pride technically severed its relationship with the plaintiffs, the express terms of the 1976 policy do not allow plaintiffs to receive severance pay.
[[Image here]]
Under the terms of the 1976 severance pay policy, and considering the nature and purpose of severance pay, Pantry Pride properly denied the employees’ applications for severance pay. Plaintiffs *249 never were unemployed, never were laid off, and never lost a day’s wages.
566 So.2d at 1307-1308 (emphasis supplied). Although it noted the holding in Demerath v. Nestle in a footnote, the court in Pantry Pride was not required to address the issue of whether the sale of a business, by itself, constituted a termination of employment. Rather, the Pantry Pride holding relied on the fact that the plaintiffs had not been affected by the closing of a plant or department, as was specifically required in the company’s written severance pay policy. The Pantry Pride case is therefore clearly distinguishable from the instant case.
We affirm the trial court’s finding that plaintiff Woods’ employment was terminated on August 1, 1988, the date of the sale of Spectrum’s assets to United. Because Woods remained employed by United past October 1, 1988, the plain language of the September 2, 1988 memo requires United, rather than Spectrum, to pay severance benefits to Woods.
AFFIRMED.
ZEHMER and WEBSTER, JJ., concur.