**In re LCCH LIQUIDATING CORPO-RATION f/k/a Lee County Community Hospital, Inc., Debtor.**

**No. 7–00–02304–WSB–11.**

United States Bankruptcy Court,
W.D. Virginia,
Roanoke Division.

Dec. 19, 2001.

United States Trustee and the Unsecured Creditors Committee have objected to the payment of one year's salary. The Motion was heard before the Court on September 26, 2001 and three witnesses testified, including Mr. G.K. Udayakumar, the former employee to whom the severance benefit is proposed to be paid. The testimony of Mr. Udayakumar, who generally goes by the abbreviated name of Kumar, has been transcribed and counsel for the parties have submitted written briefs. Although counsel for the Debtor originally requested the opportunity to present further oral arguments, that request has now been withdrawn and therefore the matter is ripe for decision.

A. Carter Magee, Jr., Magee, Foster, Goldstein & Sayers, Roanoke, VA, for LCCH Liquidating Corporation.

Roy M. Terry, Durette, Irvin & Bradshaw, P.L.C., Richmond, VA, for Official Committee of Unsecured Creditors.

Margaret K. Garber, Office of United States Trustee, Roanoke, VA, for United States Trustee.

### MEMORANDUM OPINION

WILLIAM F. STONE, Jr., Bankruptcy Judge.

The matter before the Court is the Debtor's Motion to approve payment of a severance benefit to the Hospital's former Administrator and Chief Executive Officer in the amount of one year's salary of just over $90,000 plus his accrued vacation and sick leave calculated on the basis of his current salary. No one objected to the payment of the accrued vacation and sick leave in the aggregate amount of $39,218.20 and that has been previously approved by an order of this Court. The

### FINDINGS OF FACT

Mr. Kumar originally came to Lee County Community Hospital ("the Hospital") during the regime of his predecessor, Mr. James L. Davis, as Assistant Administrator and Chief Operating Officer in 1996. His initial salary was $43,000 and he was reimbursed for his relocation expenses up to $3,000. The letter dated March 29, 1996 sent to him by Mr. Davis confirming his employment with the Hospital provided that it would give him 6 months notice of termination and he was expected to provide the same notice to the Hospital but made no provision for any termination or severance benefit. The letter also stated that he would be entitled "to all fringe benefits available to hospital employees". Unfortunately for the Hospital, Mr. Davis was subsequently revealed to be a crook and partly as a result of his nefarious schemes and partly as a result of adverse conditions affecting the hospital industry generally, by 1999 it was in desperate straits. By early 1999 Davis was gone and Mr. Kumar was employed as acting Administrator of the Hospital at a annual salary of $90,000. No written contract of

employment was prepared and the parties reached no other verbal agreement concerning the terms of employment, including whether any amount would be due the executive upon the termination of his employment. Up until that time Mr. Kumar had never been paid at a rate exceeding $68,000 per annum.

The Hospital filed a petition in this Court on July 17, 2000 under Chapter 11 of the Bankruptcy Code. It continued to operate and took many steps to stem its considerable operating losses, including terminating many of its employees and rejection of a large number of contracts upon which it was then obligated, some of which were with physicians who were providing services for or at the request of the Hospital, either as employees or as independent contractors. Mr. Kumar continued to serve the Debtor-in-possession as Chief Executive Officer and Administrator. Without dispute by anyone who has voiced an opinion to this Court, Mr. Kumar served the Hospital well both before and after its bankruptcy filing and unquestionably he rendered valuable services which were important, perhaps even critical, to its continued operation. That is not to say, however, that there were not others who also faithfully served the Hospital and whose services were important. Mr. Kumar continued to serve faithfully during the course of the bankruptcy case and did not request any contractual inducement to assure the retention of his services during this challenging time. No employee or executive retention program was ever adopted by the Debtor or approved by the Court. The Hospital was eventually sold during the course of the case to a for-profit corporation, which elected not to employ Mr. Kumar and his services came to an end on or about August 31, 2001, the closing date of the sale. No severance benefit other than payment of accrued vacation and sick pay has been paid or sug-

gested for any other employee of the Hospital whose job was terminated during the course of this case. The evidence does not disclose whether there were any other employees of the Hospital who remained in its service until August 31 but whose employment was not assumed by the purchaser.

During the course of the reorganization effort it became evident that the Hospital's ability to reorganize itself into a viable healthcare organization continuing to exist on its own was doubtful. The Board of the Hospital proposed to the Court that it be allowed to sell its operating assets to a new entity representing in effect a joint venture between itself and a larger regional healthcare organization known as Mountain States Health Alliance. Under this proposal some of the members of the Hospital's existing Board would become board members of the new entity and the Lee County community would have a continuing voice in the operation of the facility. This proposal was approved by the Court, subject, however, to bidding procedures which would allow other potential acquirers of the Hospital to come to the table. It is fair to say that the bidding procedures originally proposed by the Debtor would have tended to discourage the participation of other potential bidders, but as a result of objections raised by the United States Trustee and the Unsecured Creditors Committee as well as concerns expressed by the Court, the procedures ultimately approved were opened up significantly. As a part of its then efforts to proceed with the proposed joint venture, the Debtor agreed to and the Court approved a management agreement with Blue Ridge Medical Management Corporation ("Blue Ridge"), a subsidiary of Mountain States Health Alliance, under which Blue Ridge agreed to provide management services to the Hos-

pital. As a part of this arrangement Mr. Kumar and Mr. Frank Schmuck, then the Chief Financial Officer of the Debtor, left the direct employ of the Debtor and became employees of Blue Ridge, performing the same responsibilities and being paid the same compensation as was the case previously. The "appointment, term, salary and responsibilities" of the "qualified hospital Administrator" to be provided by Blue Ridge to the Hospital were to "be subject to the continuing approval of the Board". (Management Agreement § 3.17(a)) The Agreement further provided in § 4.2(a) in part as follows:

> All reasonable salaries, payroll taxes, fringe benefits, recruiting and moving expenses, if any, and any severance packages for all On–Site Personnel of Manager shall be as determined from time to time by Manager with the approval of the Board and shall be reimbursed by Manager to Owner.

Mr. Kumar did not demand any written contract of employment with Blue Ridge. The Court believes that it is a fair inference from the evidence that at that time both the Board and Mr. Kumar thought that it likely the joint venture would end up acquiring the facility and that Mr. Kumar and Mr. Schmuck would continue in their same jobs as before. It did not turn out that way though. A company known as Health Management Associates ("HMA") ended up acquiring the Hospital at a substantial premium over the original price proposed in the joint venture arrangement with Mountain States Health Alliance. Although the Board acting through its chairman sought to obtain a position for Mr. Kumar with HMA, the latter chose not to do so and accordingly Mr. Kumar was left without a job as of August 31, 2001.

At the hearing before the Court on this matter on September 26, 2001 Mr. Kumar was asked whether the subject of severance compensation was discussed with Blue Ridge personnel when he agreed to leave the direct employment of the Hospital and become the employee of Blue Ridge. His testimony on this point was not a model of clarity and therefore will be specifically quoted here:

> A. When I signed up with Blue Ridge, I discussed it with Marvin Eichorn that if—. My concern was, I had several years of service and I was ... was an employee of several years, and I was going into a new organization, and they expressed very clearly that if I had to leave for any reason, at least I would need to be compensated for a year's work.
>
> That is when I expressed it and requested him. And orally he said he would look into that and work on that.
>
> So that was my ... my request of one year of severance pay that I made at that time. And also my sick and vacation to be transferred from my previous employer to the new employer.

(Kumar Transcript, p. 17, line 20—p. 18, line 8)

Mr. Kumar was questioned at the hearing as to why he remained with the Hospital during its difficulties. His testimony, to his considerable credit, indicates that his motivations were other than extracting the maximum amount of personal security and benefit for himself from the Hospital. He testified as follows:

> Q. Did you approach any others outside of the hospital for employment opportunities?
>
> A. There were a couple of people who approached me but I said I am not going to look into any options at that time because of the situation.
>
> Q. My question was, did you approach anybody else?

A. Personally, no, I did not.

Q. The folks that approached you, what type of a position were they approaching you for?

A. There was just a general offer, saying, "Why don't you look at other organizations?" But I was not prepared for that.

Q. And why is that?

A. I felt a sense of dedication to the institution because as the Chief Operating Officer, my ideal was to grow the business and—. I took over as Chief Operating Officer in 1996 and ... but it took about eighteen months to two years. So we had grown about 25 percent. And my concentration was to get good services to a small community. And I felt a sense of ... when things went wrong, I felt a sense of responsibility to set things straight.

Q. Was this a difficult time for you professionally?

A. It was. It was a really, really tough situation.

Q. Why is that?

A. It was emotionally draining because of the fraud and abuse issues, and people not knowing what actually happened. And everybody being suspected. And I had to take all kinds of blames and to undo the attitude that came out in the company until the investigation was gone through. That was another reason why I didn't want to leave, because I would like ... I wanted everybody to know the exact truth of what happened. So that was a very tense moment for me.

(Kumar Transcript, p. 10, line 14—P. 11, line 22)

When it became evident, apparently, that the transaction with HMA would likely close, Mr. Jeff Whitton, an executive with Mountain States Health Alliance, proposed on behalf of Blue Ridge to the Debtor's Board that it authorize a severance package compensation payment to Mr. Kumar. According to Mr. Whitton, Blue Ridge originally proposed to the Board that it authorize a severance payment of accrued sick and vacation leave plus six months of salary and the Board adopted a resolution approving that proposal. Upon further consideration, however, Mountain States executives later decided that the salary component of the severance payment should be 12 months salary rather than six months and requested that the Hospital's Board reconsider the matter. The Board agreed and according to the Debtor's Motion on August 27, 2001, it "unanimously passed a resolution by which Mr. Kumar would be offered executive compensation for his dedication and employment services provided to the Debtor, since March 29, 1996 to the present date". Curiously, no copy of this resolution was offered into evidence at the hearing on this matter, but the Debtor did offer a Resolution indicated to have been adopted by it at a special meeting on September 25, 2001, the day immediately prior to the Court's hearing date and subsequent to the filing of its Motion to obtain court approval of the proposed arrangement. That Resolution, admitted as Debtor's Exhibit # 2, reads as follows:

RESOLVED that in recognition of the dedicated, outstanding effort and services extended to and provided by Gowdagere K. Udayakumar for the benefit of the Corporation in his capacity as both the chief Executive Officer and as the Acting Administrator and in recognition of his loyalty and outstanding leadership during the bankruptcy proceeding of the Corporation, the Board hereby ratifies and approves the payments of a severance package to Mr. Udayakumar equal to his salary for the past year, plus his accrued vacation time

and accrued sick leave time as of August 31, 2001. This severance package totals $129,219.80 allocated as follows:

(a) Salary: $90,001.60
(b) Accrued Vacation Time: $19,809.01
(c) Accrued Sick Leave $19,409.19

The Board hereby acknowledges that Mr. Udayakumar agreed not to insist on a specific severance package in negotiating his employment arrangement with the Corporation and was willing to leave such matters solely to the Board's decision.

Mr. Whitton testified that the proposed severance payment was based upon Mr. Kumar's total service to the Hospital, not just that rendered post-petition, and that there was no contractual obligation which required payment of such a benefit to Mr. Kumar. Debtor's Exhibit # 6, a letter dated April 5, 2001 from Mr. Marvin Eichorn, Senior Vice President/CEO of Mountain States, to Mr. Kumar confirming the terms of the transfer of the latter's employment from the Hospital to Blue Ridge, made no mention of any severance or termination benefit but did state that "[a]ll other employee benefits will be consistent with those provided other BR MMC management level employees." Mr. Whitton testified that there were only five senior level management employees (including Mr. Kumar and Mr. Schmuck) of Blue Ridge, none of whom had written employment contracts. Mr. Whitton further testified that during his association with Mountain States, Mr. Kumar was the only senior level management employee whose employment had been terminated without cause. From the entirety of Mr. Whitton's testimony, it is apparent that the proposed severance benefit is based upon the perceived industry standard practice for termination of a hospital administrator, not any fixed policy or practice on the part of Blue Ridge.

## CONCLUSIONS OF LAW

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 151, 157 and 1334. The matter constitutes a bankruptcy "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(A) and (B).

██ The Debtor's principal argument in support of its Motion appears to be that the Court has previously approved the Management Agreement between the Hospital and Blue Ridge, that the Agreement provided that the salaries and other benefits "and any severance packages for all On–Site Personnel of Manager" shall be determined by Manager "with the approval of the Board", that Blue Ridge has determined the proper severance benefit for Mr. Kumar and the Board has approved such determination, and therefore that the Court has already approved in advance the proposed severance payment. Because no one has questioned the good faith of either Blue Ridge or the Hospital's Board, the argument goes that the Court ought not now second-guess the Board's judgment as to a proper severance benefit for Mr. Kumar. If this position is correct, one might wonder why the present Motion has been filed if the matter has already been determined favorably to the relief sought in the Motion. While there are a number of reasonable points which might be made in response to this contention, the Court believes that it is sufficient to state that a general agreement providing for, among many other things, possible severance benefits to any Blue Ridge personnel who might serve the Hospital on-site during the period of the Management Agreement does not constitute a delegation of the Court's authority to consider the appropriateness of a proposed significant termination benefit to be paid after the fact and without any contractual obligation to do so to only one former employee when no other former employees have received

any termination payment beyond accrued vacation and sick pay, particularly when it appears that the bankruptcy estate is insufficient to pay all the Debtor's legal obligations to its creditors. Counsel for the Unsecured Creditors Committee justifiably points out that had the Debtor sought approval of a specific executive retention plan at the beginning of the case, the creditors would have had the opportunity to attempt to determine the value of such a plan to the Debtor before an obligation was incurred. Its failure to do so leads one to the conclusion that such a benefit was not necessary to secure the continuation of Mr. Kumar's services and that its payment at this time represents the Board's expression of its appreciation and gratitude to Mr. Kumar for his services and their attempt to do "right" by him.

■ The Debtor has also argued that the Board's decision to award a severance package to Mr. Kumar was made in the "ordinary course of business" pursuant to 11 U.S.C. § 364(a) and therefore within the scope of its authority. While outside of the jurisdiction of a Bankruptcy Court the determination of proper severance compensation for a company's executives or other employees is at least ordinarily within the normal authority of its Board of Directors, the Court believes that granting a package such as the one proposed here to a debtor's chief executive officer after all needed services have been rendered cannot reasonably be considered as being in the regular course of business for the purpose of § 364(a) of the Bankruptcy Code. Finally, the Debtor contends that the Board has a sound business reason for awarding severance to Mr. Kumar to avoid the possibility of facing some claim from him. The trouble with this assertion, however, is that the evidence does not support it. Such a justification would have to involve some weighing of the size and risks of some reasonably arguable claims which Mr. Kumar might have against the Hospital. One who seeks to settle possible claims against himself on a reasonable business judgment basis seeks to arrive at a compromise rather than offering more than the reasonable maximum value of such claims if successful. In short, the evidence supports a conclusion that the Board wanted to do for Mr. Kumar that which it would have been perfectly free to do if all of its creditors were being paid, not an exercise of its reasonable business judgment concerning the extent of its likely legal liability to him under the circumstances of this case.

■ While the Court is also appreciative of the services rendered by Mr. Kumar and is sensitive to its own wish to be utterly fair to him, the particular proposal before the Court cannot be approved for the relatively simple reason that its amount is based upon the entire service of Mr. Kumar to the Hospital, both pre-bankruptcy and post-filing in nature. A severance benefit based in part on pre-bankruptcy service and for which there is no contractual obligation cannot be approved for payment as a post-filing administrative expense having priority over the Debtor's general creditors. *See In re Public Ledger*, 161 F.2d 762, 773 (3rd Cir.1947); *In re M Group, Inc.*, 268 B.R. 896, 38 Bankr.Ct. Dec. 165 (Bankr.Del.2001). Furthermore, while the Bankruptcy Code does provide a priority for unpaid pre-petition services rendered by a debtor's employees over the claims of general creditors, such priority is limited to a maximum amount of $4,300 [1] per employee for "wages, salaries or com-

---

1. For cases commenced on or after April 1, 2001, this amount has been increased to $4,650.

missions, including vacation, severance, and sick leave pay" earned within 90 days prior to the filing date. 11 U.S.C. § 507(a)(3)(A). Accordingly, it may be fairly observed that the previously authorized payment to Mr. Kumar of 100% of his accrued vacation and sick leave pay accumulated over the entire course of his employment with the Hospital (more than four years of which were before bankruptcy) constitutes a severance benefit to him in excess of that which a strict application of the Bankruptcy Code might have permitted him to receive, assuming that all creditor claims against the Debtor are not going to be paid in full.

The only decision within the Fourth Judicial Circuit of the United States dealing with the subject of severance compensation to a debtor's employees which this Court has found is that of *In re Landmark Land Company of Oklahoma, Inc.*, 136 B.R. 410 (D.S.C.1992). While the Court there did approve a continuation in bankruptcy of a debtor's pre-bankruptcy policy of determining severance compensation based on an employee's entire length of service, it did so at the beginning of the case and upon a showing that such policy's continuation was believed to be important to assure the ongoing services and loyalty of the debtor's general employee population. Accordingly, the situation dealt with there is readily distinguishable from the one being considered here.

The Court notes that its decision is based on the specific proposal before it and is without prejudice to consideration of any subsequent motion which the Debtor may wish to propose for payment of an appropriate bonus to Mr. Kumar based on the value of his post-filing services to the Debtor during this case, giving due weight to the regular salary he was paid, the severance benefit previously approved, the rights Mr. Kumar would have had against the bankruptcy estates as both a pre-petition creditor and an administrative claimant, and the other circumstances of this case. Such a motion, particularly if approved by the Unsecured Creditors Committee and the United States Trustee, would justify revisiting the subject. The Court simply means to clarify specifically its present holding, not to suggest what its decision is likely to be upon some modified motion seeking similar relief. In short, it is not necessary to decide whether the extent of the Board's and the Court's discretion concerning the payment of any additional compensation to Mr. Kumar is limited by the Debtor's reasonable potential legal liability to him in order to determine that the particular severance compensation proposal before the Court ought not to be approved.

An order in accordance with the provisions of this Memorandum Opinion will be entered contemporaneously herewith.